711 F.2d 809
 LOWER BRULE SIOUX TRIBE, Appellant,
v.
STATE OF SOUTH DAKOTA, and Jack Merwin, Secretary, Division
of Game, Fish and Parks for the State of South
Dakota, Appellees.
LOWER BRULE SIOUX TRIBE, Appellee,
v.
STATE OF SOUTH DAKOTA, and Jack Merwin, Secretary, Division
of Game, Fish and Parks for the State of South
Dakota, Appellants.
 Nos. 82-1635, 82-1636.
 United States Court of Appeals,
Eighth Circuit.
 Submitted March 15, 1983.
Decided June 27, 1983.
Rehearing and Rehearing En Banc
Denied July 26, 1983.
 
 Charles A. Hobbs, Washington, D.C., for amicus curiae Three Affiliated Tribes of the Fort Berthold Reservation, North Dakota; Wilkinson, Cragun & Barker, Susan O. Berghoef, Washington, D.C., of counsel.
 Mark V. Meierhenry, Atty. Gen., Robert L. Timm, Chief Deputy Atty. Gen., Mikal Hanson, Asst. Atty. Gen., Pierre, S.D., for appellee/cross-appellant.
 Ziontz, Pirtle, Morisset, Ernstoff & Chestnut, Steven S. Anderson, Alvin J. Ziontz, Seattle, Wash., and Sonosky, Chambers, Sachse & Guido, Reid P. Chambers, Lloyd P. Miller, Washington, D.C., for Standing Rock Sioux Tribe.
 Fried, Frank, Harris, Shriver & Kampelman, Washington, D.C., for Cheyenne River Sioux Tribe.
 James R. McCurdy, Spokane, Wash., for Crow Creek Sioux Tribe.
 R. Dennis Ickes of R. Dennis Ickes, P.C., Salt Lake City, Utah, and William J. Srstka, Jr. of Duncan, Olinger, Srstka, Lovald & Robbenholt, P.C., Pierre, S.D., for appellant/cross-appellee.
 Before HEANEY and FAGG, Circuit Judges, and MAGNUSON,* District Judge.
 HEANEY, Circuit Judge.
 
 
 1
 This action involves a dispute between the State of South Dakota and the Lower Brule Sioux Tribe over which of them will regulate hunting and fishing activity at the Fort Randall and Big Bend dam and reservoir projects. Between 1954 and 1962, the United States acquired portions of the Lower Brule Sioux Reservation along the Missouri River to construct the Fort Randall and Big Bend projects. South Dakota seeks to exercise exclusive jurisdiction over hunting and fishing on the reservation land taken by the federal government for these projects. The state contends that the federal statutes authorizing the Fort Randall and Big Bend projects diminished the Lower Brule Reservation to the extent of the land taken by the United States, and abrogated the hunting and fishing rights guaranteed by treaty to the Lower Brule Sioux on that taken land.
 
 
 2
 The Lower Brule Sioux Tribe (hereafter Lower Brule Tribe or Tribe) contends that the Fort Randall and Big Bend projects did not alter the reservation boundaries or the Indian hunting and fishing rights established by the Fort Laramie Treaty of 1868. The Tribe claims that state jurisdiction threatens its territorial integrity because state law generally applies to Indians outside of the reservation and because tribal members use the taken areas for hunting, fishing and other activities. Moreover, it argues that because South Dakota hunting and fishing laws do not recognize Indians as having rights distinct from the general public, state jurisdiction over the taken land threatens the livelihood of tribal members who depend on hunting and fishing for subsistence.
 
 
 3
 On cross motions for summary judgment, the district court held that South Dakota has exclusive jurisdiction to regulate hunting and fishing by all persons--both members and nonmembers of the Tribe--within the Fort Randall and Big Bend taking areas, 540 F.Supp. 276. Because we find that the Lower Brule Reservation was not diminished and the Tribe's hunting and fishing rights were not abrogated by the federal statutes authorizing the Fort Randall and Big Bend projects, we reverse. We hold that absent federal regulation, the Tribe possesses exclusive jurisdiction to regulate hunting and fishing by tribal members on the reservation land taken for the two projects.
 
 I.
 BACKGROUND
 
 4
 In the Fort Laramie Treaties of 1851, 11 Stat. 749 (1851), and 1868, 15 Stat. 635 (1868), Congress established the boundaries of the Great Sioux Reservation. See United States v. Sioux Nation of Indians, 448 U.S. 371, 100 S.Ct. 2716, 65 L.Ed.2d 844 (1980). The Treaty of 1868 explicitly reserved the right of the Sioux to hunt and fish within certain delineated areas of the Great Sioux Reservation, including the area which is the subject of this action. In the Sioux Agreement of March 2, 1889, Congress divided the Great Sioux Reservation into several smaller ones, including the Lower Brule Reservation. 25 Stat. 888 (1889). The Lower Brule Reservation consisted of approximately 446,500 acres located in central South Dakota adjacent to and extending westward from the Missouri River. The 1889 Agreement established the reservation's eastern boundary at "the center of the main channel of the Missouri River" extending from "Old Fort George" south to "Fort Lookout." Id. at 889.
 
 
 5
 In the General Allotment Act of 1887, 24 Stat. 388 (1887), Congress empowered the President to allot land from all Indian reservations to tribal members and with tribal consent, to sell the surplus land to white settlers. In 1899, 30 Stat. 1362 (1899), and again in 1906, 34 Stat. 124 (1906), Congress opened to settlement land on the western and southern portions of the Lower Brule Reservation. As a result of these congressional enactments, over 200,000 acres of that reservation were opened to settlement by nonmembers of the Tribe; but the reservation's eastern boundary on the Missouri River was not altered, nor was land along the river opened for settlement.
 
 
 6
 In the Flood Control Act of 1944, Pub.L. No. 78-534, 58 Stat. 887 (1944) (codified as amended at 16 U.S.C. § 460d (1976)), Congress authorized the establishment of a comprehensive flood control plan along the Missouri River, the Missouri River Basin Project. The 1944 Act did not authorize the acquisition of Indian property, but seven subsequent statutes authorized limited takings of Indian lands for specific hydroelectric and flood control dams on the Missouri River in North and South Dakota.[1] These dams created huge lake-like reservoirs to control the Missouri River's seasonal flooding and to end the periodic devastation caused downstream. The Indian lands taken were of great value because the river bottomland was well suited for raising and grazing domestic animals and was rich in game, and the river was well stocked with fish.
 
 
 7
 The lands taken for two of these flood control projects--the Fort Randall and the Big Bend--are at issue here. To construct these two projects, the United States acquired tribal and trust lands from the Lower Brule Tribe on the eastern boundary of its reservation along the Missouri River. By Act of July 6, 1954, Congress directed the Corps of Engineers to construct the Fort Randall Dam and Reservoir project. Pub.L. No. 83-478, 68 Stat. 452 (1954). Thereafter, the Corps commenced eminent domain proceedings in federal district court to acquire the necessary land on the Lower Brule Reservation. United States v. 7,996.92 Acres of Land, More or Less, in Lyman County, South Dakota, Civ. No. 186 C.D. (June 25, 1963). In September, 1958, Congress enacted Pub.L. No. 85-923, 72 Stat. 1773 (1958) (hereafter Fort Randall Act) to provide compensation to the Tribe and its members for the land taken to construct the Fort Randall Dam and Reservoir Project. In October 1962, Congress passed Pub.L. No. 87-734, 76 Stat. 698 (1962) (hereafter Big Bend Act), which authorized the acquisition of and payment for tribal and trust lands on the Lower Brule Reservation needed for the Big Bend Dam and Reservoir Project.
 
 
 8
 Both the State of South Dakota and the Tribe have sought to exercise jurisdiction over the land taken from the Lower Brule Reservation by the United States for these two projects, and the Tribe and state occasionally have adopted conflicting hunting and fishing regulations. For example, South Dakota prohibits the use of lead or other toxic shot for hunting water fowl, while the Tribe does not. In the past, the Tribe and state have established different water fowl hunting and fishing season restrictions. Both the Tribe and the state seek to derive income through hunting and fishing fees and licenses for the taken areas, and both have established their own wildlife refuges within the Big Bend taking area.
 
 
 9
 Because the Tribe was concerned that the state's efforts to exercise jurisdiction over hunting and fishing within the Fort Randall and Big Bend taking areas threatened the livelihood of its members as well as the territorial integrity of its reservation, it commenced this action in the court below seeking declaratory and injunctive relief. The Tribe requested a declaration that South Dakota lacked jurisdiction to regulate the hunting and fishing activities of any person within the exterior boundaries of the Lower Brule Reservation, including the Fort Randall and Big Bend taking areas. It also sought to enjoin the state from applying and enforcing its hunting and fishing laws against both members and nonmembers of the Tribe within the reservation boundaries. The state counterclaimed seeking a declaration that it possessed exclusive jurisdiction to regulate hunting and fishing by all persons within the area taken for the Fort Randall and Big Bend projects. It contended that the Flood Control, Fort Randall, and Big Bend Acts diminished the Lower Brule Reservation to the extent of the taken area and that these acts abrogated the provisions of the 1868 Fort Laramie Treaty reserving the Tribe's hunting and fishing rights within those areas.
 
 
 10
 On cross motions for summary judgment, the district court held that although the Big Bend Act did not diminish the Lower Brule Reservation, the Fort Randall Act effected a diminishment to the extent of the land taken for the Fort Randall Dam and Reservoir Project. The court further held that the Flood Control, Fort Randall, and Big Bend Acts together abrogated the rights of the Lower Brule Tribe under the 1868 Fort Laramie Treaty to hunt, fish and exclusively occupy and use the land within the Fort Randall and Big Bend taking areas. Finally, the court held that pursuant to these three federal statutes, South Dakota possesses exclusive jurisdiction to regulate hunting and fishing by all persons within the taken areas.[2] Both parties now appeal.
 
 II.
 DISESTABLISHMENT
 
 11
 "A federal treaty, statute, or agreement setting aside a reservation for the use and occupation of a tribe is necessarily preemptive of state jurisdiction over Indian hunting and fishing activity on the reservation." Getches, Federal Indian Law: Cases and Materials 618 (1978). Thus, when Congress established the Lower Brule Reservation in the 1868 Fort Laramie Treaty, the Lower Brule Sioux acquired the right to hunt and fish on the reservation free of state law.
 
 
 12
 The first issue presented here is whether the Big Bend Act and/or the Fort Randall Act disestablished or diminished[3] the boundaries of the Lower Brule Reservation. If no disestablishment occurred, the 1868 Fort Laramie Treaty would continue to preempt the application of state hunting and fishing laws on the reservation, and the Tribe would retain jurisdiction over tribal hunting and fishing on the land in controversy, except to the extent that the Tribe's rights have been abrogated by subsequent congressional action. See Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977); DeCoteau v. District County Court, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975). If either Act disestablished the reservation boundaries, the application of state law on the land taken by that Act no longer would be preempted, and South Dakota would have jurisdiction to regulate hunting and fishing by tribal members on that land absent federal law preserving the Indians' treaty hunting and fishing rights. See id.; Menominee Tribe v. United States, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968).
 
 
 13
 The Supreme Court and this Court have frequently addressed disestablishment questions.[4] Several principles developed in these cases control our inquiry in the present case.
 
 
 14
 Once Congress has established a reservation, all tracts included within the boundaries remain a part of the reservation until separated from it by Congress. DeCoteau v. District County Court, supra, 420 U.S. at 444, 95 S.Ct. at 1092-93. Congressional action removing certain reservation land from Indian ownership does not necessarily disestablish reservation boundaries. Disestablishment occurs only when Congress intends to create a smaller reservation with adjusted boundaries. United States v. Dupris, 612 F.2d 319, 320-322 (8th Cir.1979); United States ex rel. Condon v. Erickson, 478 F.2d 684, 687 (8th Cir.1973). It does not occur if Congress only intended to remove from Indian control certain land within the reservation boundaries while retaining its original exterior boundaries. Id.
 
 
 15
 Thus, congressional intent controls our analysis and we can find disestablishment only if Congress unmistakenly intended that result. See Rosebud Sioux Tribe v. Kneip, supra, 430 U.S. at 603, 97 S.Ct. at 1371 (evidence "leads us * * * to the firm conclusion that congressional intent was to exclude Gregory County from the Rosebud Reservation") (emphasis added); DeCoteau v. District County Court, supra, 420 U.S. at 445, 95 S.Ct. at 1093 (relevant factors "all point unmistakenly to the conclusion that the Lake Traverse Reservation was terminated in 1891") (emphasis added). In DeCoteau, the Supreme Court stated:
 
 
 16
 This Court does not lightly conclude that an Indian reservation has been terminated. "[W]hen Congress has once established a reservation all tracts included within it remain a part of the reservation until separated therefrom by Congress." * * * The congressional intent must be clear, to overcome "the general rule that '[d]oubtful expressions are to be resolved in favor of the [Indians].' " * * * Accordingly, the Court requires that the "congressional determination to terminate * * * be expressed on the face of the Act or be clear from the surrounding circumstances and legislative history."
 
 
 17
 DeCoteau v. District County Court, supra, 420 U.S. at 444, 95 S.Ct. at 1092-93 (citations omitted, emphasis added).
 
 
 18
 With these principles in mind, we turn to the question of whether the Big Bend and Fort Randall Acts disestablished the boundaries of the Lower Brule Reservation.
 
 A. The Big Bend Act
 
 19
 The district court held that the Big Bend Act did not disestablish the boundaries of the Lower Brule Reservation. South Dakota contends that the district court erred because the face of the Act, as well as its legislative history and surrounding circumstances demonstrate that Congress intended to disestablish the reservation to the extent of the land taken in the Act. We disagree.
 
 
 20
 In United States v. Wounded Knee, 596 F.2d 790 (8th Cir.), cert. denied, 442 U.S. 921, 99 S.Ct. 2847, 61 L.Ed.2d 289 (1979), this Court faced the precise issue presented here, and held that Congress in the Big Bend Act did not intend to disestablish the reservation boundaries.[5] Although the land in issue in Wounded Knee was taken from the Crow Creek Sioux Reservation by the Big Bend Act, we are bound by that precedent.[6]
 
 
 21
 Notwithstanding Wounded Knee, South Dakota--relying on the Supreme Court's decisions in Rosebud Sioux v. Kneip, supra and DeCoteau v. District County Court, supra[7]--contends that language of the Big Bend Act is "precisely suited" to evince Congress' intent to disestablish reservation boundaries. We disagree. The Wounded Knee Court had the benefit of both Rosebud and DeCoteau, and yet found no clear expression of intent to disestablish.
 
 
 22
 Section 1(a) of the Big Bend Act provides in part that "[t]he entire interest * * * [and] any interest the tribe or Indians may have within the bed of the Missouri River * * * are hereby taken by the United States for the Big Bend Dam and Reservoir Project on the Missouri River * * *." Pub.L. No. 87-734, § 1(a), 76 Stat. at 698. That section also provides that a sum certain be paid "in settlement of all claims, rights, and demands of the tribe and individual Indians arising out of the taking under this Act." Id.
 
 
 23
 This language falls short of that utilized by Congress when it has unequivocally expressed its intent to disestablish a reservation's boundaries.[8] Indeed, in Rosebud and DeCoteau, the Supreme Court recognized that statutory provisions very similar to those employed in section 1(a) of the Big Bend Act did not constitute "clear language of express termination," as is evident from the Court's heavy reliance on the legislative histories and surrounding circumstances of the acts in question to support its findings of disestablishment. See Rosebud Sioux Tribe v. Kneip, supra, 430 U.S. at 589-615, 97 S.Ct. at 1364-1378; DeCoteau v. District County Court, supra, 420 U.S. at 431-449, 95 S.Ct. at 1086-1095.
 
 
 24
 Because a clear congressional intent to disestablish cannot be found on the face of the Big Bend Act, the necessary intent can be found only if there is operative statutory language that is "precisely suited" to the purpose of disestablishment and this purpose is confirmed by the Act's legislative history and surrounding circumstances. See DeCoteau v. District County Court, supra, 420 U.S. at 444-445, 95 S.Ct. at 1093. In Wounded Knee, we concluded that neither the legislative history nor surrounding circumstances of the Act demonstrate a clear intent to disestablish.
 
 
 25
 The legislative history is ambiguous. As we stated in Wounded Knee:
 
 
 26
 while there are a few stray phrases which could be interpreted as indicating both the presence and the absence of diminishment, we are mindful that "[a] congressional determination to terminate must be expressed on the face of the Act or be clear from the surrounding circumstances and legislative history." Mattz v. Arnett, 412 U.S. at 505, 93 S.Ct. at 2258. [Emphasis included.] There is simply nothing in the legislative history which satisfies this requirement.
 
 
 27
 United States v. Wounded Knee, supra, 596 F.2d at 796 (footnote omitted).
 
 
 28
 Moreover, the Big Bend Act's surrounding circumstances suggest that Congress did not intend to disestablish the Lower Brule Reservation. One of the Act's "principal purposes * * * [was] to provide for the improvement of the social and economic conditions of the members of the Lower Brule Sioux Tribe." S.Rep. No. 1636, 87th Cong., 2d Sess. 3 (June 28, 1962). As in Wounded Knee, however, the property taken for the Big Bend project included some of the most important reservation land. The report of the Senate Committee considering the Big Bend bill referred to the taken land as the Tribe's "best bottom land" and described at some length the land's value to the Indians:
 
 
 29
 Most of the Indians on the reservation live in the vicinity of the Missouri River and the tributary streams and creeks. These locations are accessible to water for domestic purposes. They contain the rich river bottom lands and the timbered area which supplies firewood and building material and provides shelter for livestock. They have been the habitat of the game and the prime source of the natural products on which Indians depend in part for subsistence. They have carried the livestock of the entire reservation in drought years. They have provided sheltered feeding areas essential to successful stock operations.
 
 
 30
 Id. at 3, 7.
 
 
 31
 An intent to remove this valuable river bottomland from the reservation would hardly be consistent with Congress' concern for promoting the economic development of the Tribe.
 
 
 32
 In addition, because the reservation land was taken in order to construct a dam and reservoir, continued Indian control of this land is not inconsistent with the federal government's purpose in acquiring the property, as might be the case if, for example, the reservation was acquired to permit settlement by non-Indians. See note 10, infra. In fact, subsequent to the construction of the Big Bend Dam and Reservoir Project, the members of the Lower Brule Tribe have continued to utilize the land and exploit its resources, and the Tribe has regulated hunting and fishing within the taken area. As we concluded in Wounded Knee, this jurisdictional history militates against a finding of disestablishment. United States v. Wounded Knee, supra, 596 F.2d at 790.[9]
 
 
 33
 In summary, neither the language on the face of the Big Bend Act nor its legislative history and surrounding circumstances support a finding of disestablishment.[10] Accordingly, the district court's judgment with respect to the Big Bend Act is affirmed.
 
 B. The Fort Randall Act
 
 34
 The district court held that Congress intended to disestablish the Lower Brule Reservation to the extent of the area taken by the Fort Randall Act. Because we find that such an intent is not expressed on the face of the Act, nor clearly demonstrated by its legislative history and surrounding circumstances, we reverse.
 
 
 35
 The district court primarily based its Fort Randall holding on our decision in Wounded Knee and on Section 6 of the Fort Randall Act, which refers to the "[reservation] boundaries as diminished." Pub.L. No. 85-923, § 6, 72 Stat. at 1774. In holding that the Big Bend Act did not disestablish the boundaries of the Crow Creek Reservation in Wounded Knee, we contrasted the omission of the phrase "as diminished" from the Big Bend Act with its inclusion in the Fort Randall Act and three other statutes authorizing takings for flood control projects in the Missouri River Basin Project.
 
 
 36
 In Wounded Knee, however, we did not conclude that Congress intended to disestablish reservation boundaries in the Fort Randall Act.[11] Instead, we cautioned that the reference to the "as diminished" phrase in the other taking statutes was "merely to compare and contrast the earlier acts with P.L. 87-735 [Big Bend Act] in an attempt to divine the intent of Congress with regard to P.L. 87-735." United States v. Wounded Knee supra, 596 F.2d at 795 n. 8. Moreover, we stated that our comparison was based on the parties' "assum[ption] here and in the district court that [the Fort Randall Act] diminished the [reservation] by taking a strip of land along the Missouri River." Id. The Crow Creek and Lower Brule Sioux Tribes were not parties to the Wounded Knee case. The only representatives before the district court in that case were the United States Attorney for South Dakota and counsel for a criminal defendant.[12] Id. at 791-793. Moreover, the Wounded Knee Court did not undertake any review of the legislative history or surrounding circumstances of the Fort Randall Act since the offense involved in the case had occurred on the Big Bend portion of the reservation. The reference was made as an index of comparison only and the required analysis was never performed regarding the Fort Randall Act.
 
 
 37
 In sum, the teaching of Wounded Knee lies in its holding and analysis that the Big Bend Act did not accomplish a disestablishment of the reservation. In approaching the issue of whether the Fort Randall Act disestablished the reservation, the same careful analysis must be employed.
 
 
 38
 The state first points to section 1 of the Fort Randall Act, which provides for a sum certain payment:
 
 
 39
 in settlement of all claims, rights and demands of said tribe and its members arising out of the construction of the Fort Randall Dam and Reservoir Project[.]
 
 
 40
 Pub.L. No. 85-923, § 1, 72 Stat. at 1773.
 
 
 41
 This language is virtually identical to that employed in section 1(a) of the Big Bend Act. See supra, at 816-817. We found no clear expression of an intent to disestablish in section 1(a) of the Big Bend Act, and we find none in section 1 of the Fort Randall Act.
 
 
 42
 Section 6 of the Fort Randall Act authorizes the federal government to purchase and sell certain lands "either inside or outside the [reservation] boundaries as diminished." Pub.L. No. 85-923, § 6, 72 Stat. at 1774. There is no equivalent language in the Big Bend Act. This statutory language is consistent with a congressional intent to disestablish. Nonetheless, we believe that this "as diminished" phrase does not establish a congressional determination to disestablish which is expressed on the face of the statute. This isolated phrase in a section of the Fort Randall Act having nothing to do with the location of reservation boundaries falls short of "clear language of express disestablishment." Mattz v. Arnett, supra, 412 U.S. at 504 & n. 22, 93 S.Ct. at 2258 & n. 22. See note 8 supra. A clear and unambiguous intent to disestablish cannot be found from isolated phrases in the statutory language. United States v. Dupris, supra, 612 F.2d at 332; United States ex rel. Condon v. Erickson, supra, 478 F.2d at 686-687.
 
 
 43
 Erickson is particularly instructive here. We held in that case that no disestablishment was effectuated by a provision in a 1908 statute involving the Cheyenne River Tribe which permitted allottees on the opened area of the reservation to select substitute lands on the "reservation thus diminished." We stated:
 
 
 44
 In § 2 of the 1908 Act it is stated as a proviso that the Secretary may permit Indians who have received allotments in the area opened to settlement to relinquish such and receive a new allotment "within the respective reservation thus diminished * * *." [Emphasis included.] This proviso is subject to two competing constructions. The reservation thus diminished, as contended by appellant, means a smaller reservation with adjusted boundaries. On the other hand, the reservation could have retained its original exterior boundaries even though the portion held by Indians was diminished by virtue of the sale of lands within the boundaries to outsiders.
 
 
 45
 United States ex rel. Condon v. Erickson, supra, 478 F.2d at 687 (emphasis added).
 
 
 46
 In discussing the relevant legislative history, we again emphasized the different constructions that might be given to the "diminished" language:
 
 
 47
 Both the House and Senate Committee reports are silent as to the 1908 Act's effect upon the boundaries of the Cheyenne River Reservation. Appellant points out the various references in the reports and attached documents to a diminished reservation and a relinquishment of land by the Indians. [Emphasis included.] A reservation, however, as already pointed out, may be diminished in land size by sale of portions thereof to non-Indians without changing the reservation's boundaries.
 
 
 48
 Id. at 688 (footnote omitted, emphasis added).
 
 
 49
 Here, as in Erickson, the statutory phrase "as diminished," standing alone, is ambiguous and does not demonstrate a clear congressional intent to disestablish the reservation boundaries. Therefore, only clear legislative history and surrounding circumstances would support the district court's decision. We, however, can find nothing in the Fort Randall Act's legislative history and surrounding circumstances which is significantly different than that underlying the Big Bend Act. Thus, we must find that there is insufficient evidence of disestablishment to overcome the general rule that doubtful expressions of intent must be resolved in favor of the Indians. See supra, at 815-816.
 
 
 50
 The district court observed that "[t]he legislative history of the acts provides little guidance concerning the [disestablishment issue]." With this statement we must agree. The history relevant to the question of reservation disestablishment in the taken area is sparse, and that which exists is ambiguous. In fact, there is nothing which significantly differentiates the legislative history of the Fort Randall Act from that of the Big Bend Act. Accordingly, "while there are a few stray phrases which could be interpreted as indicating both the presence and the absence of diminishment, * * * [t]here is simply nothing in the legislative history which satisfies" the requirement that the history clearly show an intent to disestablish when Congress has not expressed that purpose on the face of the statute. United States v. Wounded Knee, supra, 596 F.2d at 796.
 
 
 51
 Similarly, an intent to disestablish cannot be found in the surrounding circumstances of the Fort Randall Act. Again, these surrounding circumstances are virtually identical to those of the Big Bend Act. In both instances, the reservation lands were taken for flood control projects rather than for settlement. The exercise of jurisdiction by the Tribe over the land taken by the Acts is not inconsistent with the purpose of the authorized takings. The Lower Brule Sioux, in fact, have utilized the land taken and have sought to enforce their laws on it. Finally, these circumstances stand in sharp contrast to those present in Rosebud and DeCoteau which led the Supreme Court to conclude that the surrounding circumstances of the "surplus land" statutes in question showed a clear congressional intent to disestablish the Rosebud and Lake Traverse Reservations. See supra at 817-818 & n. 10.
 
 
 52
 In addition, the district court's conflicting conclusions on the disestablishment question with regard to the Fort Randall and Big Bend Acts imputes to Congress a very impractical and unlikely purpose with respect to flood control on the Missouri River. If the court below was correct, it would mean that in acquiring the land necessary for the comprehensive Missouri River Basin Project through the seven taking statutes, see note 1, supra, Congress in the first Act (1949 Fort Berthold Garrison Act) and the last two Acts (1962 Crow Creek and Lower Brule Big Bend Acts) preserved existing reservation boundaries, but in the middle four Acts (1954 Cheyenne River Oahe Act, 1958 Standing Rock Oahe Act, 1958 Crow Creek and Lower Brule Fort Randall Acts), by inclusion of the words "as diminished," it did not do so. There simply is no indication that Congress intended to create such an unusual and impractical result.
 
 
 53
 Finally, in the Big Bend Act, which was enacted four years after the Fort Randall Act, Congress expressed its understanding that the lands taken by both Acts were within the Lower Brule Reservation. Section 11 of the Big Bend Act authorized the purchase of substitute lands for individuals holding allotments "within the taking area of the Fort Randall or Big Bend projects," and provided that the land selected may be "inside or outside the boundaries of the reservation." Pub.L. No. 87-734, § 11, 76 Stat. at 701. No reference was made to the reservation "as diminished." Id. Moreover, there are repeated references in the legislative history of the Big Bend Act, by members of Congress and various government departments, to both taking areas as being "within the reservation" or "on the reservation." See S.Rep. No. 1636, 87th Cong., 2d Sess. 11, 16, 21 and 31 (June 28, 1962); H.Rep. No. 852, 87th Cong., 1st Sess. 14, 21, 26, 30 and 31 (Aug. 5, 1961).[13] These expressions confirm the apparent intent of Congress in 1954 when it directed the Corp of Engineers to negotiate with the Lower Brule Sioux to acquire the land necessary for the Fort Randall project and specifically referred to the area to be taken as "within the reservation." Act of July 6, 1954, Pub.L. No. 83-478, § 2(c), 68 Stat. at 453.[14]
 
 
 54
 In summary, neither the Big Bend Act nor the Fort Randall Act disestablished the boundaries of the Lower Brule Reservation. Nonetheless, even though the land taken for the two flood control projects remains in the reservation, the Lower Brule Sioux do not retain their treaty right to hunt and fish on the reservation free from state regulation if that right was abrogated by the Fort Randall and Big Bend Acts. We turn to that question now.
 
 III.
 ABROGATION
 
 55
 When Congress established the Lower Brule Reservation in the 1868 Fort Laramie Treaty, the Lower Brule Sioux acquired the right to hunt and fish on the reservation free of state law. See supra, at 814-815. Nonetheless, Congress has the power to unilaterally abrogate Indian treaty rights and to authorize the application of state law to Indian activities on reservation land. McClanahan v. Arizona State Tax Commission, 411 U.S. 164, 170-172, 93 S.Ct. 1257, 1261-1262, 36 L.Ed.2d 129 (1973); United States v. White, 508 F.2d 453, 456 (8th Cir.1974). In order to abrogate treaty rights and authorize the application of state law, however, Congress must expressly do so.[15] Id. Moreover, any doubtful expressions of congressional intent must be resolved in favor of the Indians. United States v. Winnebago Tribe of Nebraska, 542 F.2d 1002, 1006 (8th Cir.1976). The Supreme Court has cautioned that "the intention to abrogate or modify a treaty is not to be lightly imputed to the Congress." Menominee Tribe v. United States, supra, 391 U.S. at 413, 88 S.Ct. at 1711. With these principles in mind, we turn to the question of whether the hunting and fishing rights of the Lower Brule Sioux were abrogated by the federal statutes authorizing the Fort Randall and Big Bend projects.
 
 
 56
 The district court held that the Fort Randall and Big Bend Acts abrogated the rights guaranteed to the Lower Brule Sioux by the 1868 Fort Laramie Treaty to exclusively use and occupy the reservation land and to hunt and fish on that land free of state regulation.[16] Because we find that Congress did not intend to abrogate the Indians' treaty-reserved hunting and fishing rights when it enacted the Fort Randall and Big Bend Acts, we reverse the district court's judgment on this issue.[17]
 
 
 57
 The district court initially concluded that a finding of abrogation was supported by the plain language of the Fort Randall and Big Bend Acts. The court relied on Red Lake Band of Chippewa Indians v. Minnesota, 614 F.2d 1161 (8th Cir.), cert. denied, 449 U.S. 905, 101 S.Ct. 279, 66 L.Ed.2d 136 (1980), to state that "[i]t has been held that statutes which remove 'all right, title and interest' of a tribe in certain land operate to extinguish hunting and fishing rights in the land." Then citing statutory language in the Fort Randall Act (section 1) referring to the "settlement of all claims, rights and demands" arising from the project's construction, and in the Big Bend Act (section 1(a)) referring to a taking of the Tribe's "entire interest" in the specified land, the court concluded that these provisions alone "may be * * * sufficient indicia of congressional intent to extinguish treaty hunting and fishing rights of the Tribe within the taken area." We cannot agree.
 
 
 58
 The district court's reliance on this Court's Red Lake decision was misplaced. In that case, we explicitly emphasized that our finding of abrogation of hunting and fishing rights was premised on the fact that the reservation had been diminished when the Chippewa voluntarily ceded the property in question to the United States. Red Lake Band of Chippewa Indians v. Minnesota, supra, 614 F.2d at 1162. Red Lake does not stand for the proposition that Congress necessarily abrogates treaty-reserved hunting and fishing rights when it uses statutory language taking an interest in certain reservation land. When, as here, the statutes in question have not disestablished reservation boundaries, general language referring to the "entire interest" or "all claims" in certain land falls short of stating a clear purpose to abrogate specific treaty rights. United States v. White, supra, 508 F.2d at 455-458.
 
 
 59
 The district court supported its finding of abrogation with two passages from the legislative history which referred to "treaty" rights when discussing the property rights taken from the Lower Brule Sioux.[18] The court's reliance on this legislative history was misplaced. It failed to recognize that the Tribe's treaty hunting and fishing rights are severable from their treaty rights to exclusively own, occupy and utilize the land granted to them as a reservation.[19] Thus, when the United States acquired reservation land to construct the Fort Randall and Big Bend projects, the Lower Brule Sioux necessarily lost their treaty rights to exclusively own, occupy and utilize that land. The Indians' treaty rights to hunt and fish free of state regulation, however, were not necessarily abrogated by the Fort Randall and Big Bend takings since they could still exercise those rights after the projects were completed. Accordingly, the general references in the taking acts' legislative histories to undifferentiated "treaty" rights acquired by the United States do not clearly establish that Congress intended to abrogate the hunting and fishing rights of the Lower Brule Sioux.
 
 
 60
 The Supreme Court decision in Menominee Tribe v. United States, supra, is instructive here. The Court held that the Menominee Termination Act of 1954, which expressly terminated the reservation and subjected the Tribe and its members to state law generally, did not extinguish the Menominees treaty hunting and fishing rights or authorize Wisconsin to impose its hunting and fishing laws on the members of the Tribe. 391 U.S. at 412-413, 88 S.Ct. at 1710-1711. In the absence of an explicit repeal, the Court stated that no abrogation would be inferred even though the reservation had been terminated because "the intention to abrogate or modify a treaty is not to be lightly imputed to the Congress." Id. at 413, 88 S.Ct. at 1711.
 
 
 61
 We thus turn to the final evidence relied upon by the district court to support its finding of abrogation. The Fort Randall and Big Bend Acts recognize the right of the Tribe to have "free access" to the Missouri River shoreline, "including the right to hunt and fish along the aforesaid shoreline and reservoir," but provide that those rights are "subject * * * to regulations governing the corresponding use by other citizens of the United States." Pub.L. No. 85-923, § 5, 72 Stat. at 1774 (Fort Randall Act); Pub.L. No. 87-734, § 10, 76 Stat. at 701 (Big Bend Act). The district court seized upon this language to conclude that Congress contemplated subjecting Indians to the application of state laws by the states, and thus it intended to abrogate the hunting and fishing treaty rights of the Lower Brule Sioux.
 
 
 62
 The "corresponding use" clause, contrary to the views of the court below and South Dakota, does not clearly and unambiguously subject the hunting and fishing rights of the Lower Brule Sioux to state regulation. Indeed, the clause makes no explicit reference to state law, and thus, the "regulation" contemplated could be either by the federal government through the Secretary of Army and Corps of Engineers or by the state.
 
 
 63
 The Supreme Court's decision in Menominee Tribe v. United States, supra, again is helpful here. The Termination Act of 1954 provided that after the Tribe conveyed title to all reservation property to the State of Wisconsin, federal supervision would cease and "the laws of the several States shall apply to the tribe and its members in the same manner as they apply to other citizens or persons within their jurisdiction." 391 U.S. at 410, 88 S.Ct. at 1709. Despite this language, which is more explicit as to the application of state law than the language in the Fort Randall and Big Bend Acts, the Supreme Court did not find that Congress had abrogated the Tribe's hunting and fishing rights and authorized Wisconsin to apply its laws to tribal members. Rather, after considering other factors--including the Termination Act's legislative history and other relevant Indian statutes--the Court found that the Act did not abrogate the Menominee's hunting and fishing rights even though it had terminated the reservation. Id. at 412-413, 88 S.Ct. at 1710-1711.
 
 
 64
 We thus must look beyond the "corresponding use" language of Section 5 of the Fort Randall Act and Section 10 of the Big Bend Act to determine whether there is other evidence which will confirm that Congress clearly intended to abrogate the Lower Brule Sioux's hunting and fishing rights.
 
 
 65
 The relevant legislative histories in the Fort Randall and Big Bend Acts do not support a finding of abrogation. Although some passages suggest that Congress intended to abrogate the Tribe's hunting and fishing rights, others support a contrary conclusion.[20] Such ambiguous evidence does not demonstrate a clear congressional intent to abrogate the hunting and fishing rights that are so important to the Tribe and its members.
 
 
 66
 Nor do the surrounding circumstances of the Fort Randall and Big Bend Acts support a finding of abrogation. The Fort Randall and Big Bend projects, as well as the other dam and reservoir projects in the Missouri River Basin Project, were developed under the general authority created by Congress in the Flood Control Act of 1944. Pub.L. No. 78-534, 58 Stat. at 887 (codified as amended at 16 U.S.C. § 460d (1976)). The Act created a general scheme of federal, not state, regulation of the flood control projects it authorized. The Act, enacted in response to national needs,[21] contemplated that the United States would pay for the acquisition of land for the projects and would pay for construction of the dams, authorized the Army Corps of Engineers and Secretary of the Army (then Secretary of War) to operate the projects,[22] and provided that the Secretary of the Army should enact and enforce regulations to safeguard the projects.[23] Such a system of federal regulation is inconsistent with an abrogation of the Indians' treaty rights to hunt and fish on their reservations free of state regulation, and the 1944 Act reveals no congressional intent to abrogate those rights.
 
 
 67
 In addition, the fact that the Fort Randall and Big Bend Acts authorize the taking of Indian land and the development of flood control projects does not itself create any suggestion that Congress contemplated abrogating the Indians' right to hunt and fish free of state regulation. There simply is nothing about the construction of a federal dam and reservoir project that necessarily requires Indians to lose their hunting and fishing rights. In contrast, the treaty right to exclusive occupation and use of reservation land is necessarily taken from an Indian tribe when a federal flood control project, which is also used for recreational activities by all persons, is constructed on the reservation.
 
 
 68
 Finally, there are two other factors which the district court considered important. The court was impressed with Congress' failure to provide more explicit protection for treaty hunting and fishing rights when it enacted the Flood Control, Fort Randall, and Big Bend Acts. It is settled, however, that federal preemption of state regulation of Indian hunting and fishing rights guaranteed by treaty is not dependent on specific reaffirmation by Congress each time it legislates with respect to an Indian reservation. White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 141-145, 100 S.Ct. 2578, 2582-2584, 65 L.Ed.2d 665 (1980); McClanahan v. Arizona State Tax Commission, supra, 411 U.S. at 170-172, 93 S.Ct. at 1261-1262. Rather, the opposite is true: unless Congress expressly authorizes their application, state laws do not apply to tribal members on their reservations. McClanahan v. Arizona State Tax Commission, supra, 411 U.S. at 170-172, 93 S.Ct. at 1261-1262.
 
 
 69
 The district court also plainly believed that state jurisdiction over tribal hunting and fishing in the Fort Randall and Big Bend taking areas was necessary to avoid jurisdictional confusion in those areas. Much of the potential for confusion perceived by the district court, however, was premised on its erroneous conclusion that the Fort Randall Act disestablished the boundaries of the Lower Brule Reservation.[24] Moreover, although practical problems of law enforcement may be a relevant factor in determining abrogation questions, such problems cannot support a finding of abrogation when no clear congressional intent to do so is expressed in a statute or its legislative history and other surrounding circumstances.
 
 
 70
 Ultimately, the district court's principal error in resolving the abrogation issue was that it failed to consider the possibility that Congress intended to limit the treaty hunting and fishing rights, by subjecting them to regulation by the Corps of Engineers or Secretary of Army, but not totally abrogate the Tribe's right to hunt and fish on its reservation free of state regulation. The comments of the Supreme Court in 1905 in United States v. Winans, 198 U.S. 371, 381, 25 S.Ct. 662, 664, 49 L.Ed. 1089 (1905), concerning the treaty fishing rights of the Northwest Tribes remain germane today:
 
 
 71
 New conditions came into existence, to which those rights had to be accommodated. Only a limitation of them, however, was necessary and intended, not a taking away.
 
 
 72
 In summary then, we hold that the Flood Control, Fort Randall and Big Bend Acts did not abrogate the treaty right of the Lower Brule Sioux to hunt and fish on their reservation free of state regulation. Congress was well aware that it could unilaterally terminate tribal rights and has done so on many occasions. See Bryan v. Itasca County, 426 U.S. 373, 389-390 & n. 15, 96 S.Ct. 2102, 2111-2112 & n. 15, 48 L.Ed.2d 710 (1976). Nonetheless, in the Fort Randall and Big Bend Acts, it failed to expressly abrogate the treaty hunting and fishing rights of the Lower Brule Sioux and to subject them to state law. Moreover, neither the legislative histories nor surrounding circumstances of those Acts reveals a clear congressional purpose to effectuate such an abrogation. Because we can find that Congress has abrogated Indian treaty rights only if it has clearly expressed its intent to do so and because doubtful expressions of intent must be resolved in favor of the Indians, see supra, at 822, we must reverse the district court's finding that Congress has abrogated the treaty right of the Lower Brule Sioux to hunt and fish free of state regulation within the Fort Randall and Big Bend taking areas and has expressly authorized South Dakota to apply its laws to hunting and fishing activities by tribal members within those reservation areas.
 
 IV.
 REGULATORY JURISDICTION
 
 73
 Because of our holding on the disestablishment and abrogation issues, we must also reverse the district court's finding that South Dakota has exclusive jurisdiction to regulate hunting and fishing by members of the Lower Brule Tribe within the Fort Randall and Big Bend taking areas. The Flood Control, Fort Randall and Big Bend Acts could not have conferred such exclusive regulatory jurisdiction on South Dakota when they neither disestablished the Lower Brule Reservation, abrogated the Tribe's treaty right to hunt and fish on the reservation free of state regulation, nor authorized the application of state law to the hunting and fishing activities of tribal members on the reservation within the taken areas. See supra, at 815, 821-822. Accordingly, the Lower Brule Sioux retain jurisdiction over tribal hunting and fishing within the land in controversy here, subject only to federal regulation authorized by Congress. Id. See New Mexico v. Mescalero Apache Tribe, --- U.S. ----, ---- - ----, 103 S.Ct. 2378, 2382-2387, 76 L.Ed.2d 611 (1983).
 
 
 74
 In addition, the district court held that South Dakota possesses exclusive jurisdiction to regulate hunting and fishing by nonmembers of the Lower Brule Tribe within the Fort Randall and Big Bend taking areas. We believe that this judgment must be vacated and remanded for reconsideration in light of our decision here. We cannot be certain that the district court's erroneous disestablishment and abrogation findings did not influence its determination that the state can exclusively regulate hunting and fishing by nonmembers of the Tribe within the taken areas. Indeed, that determination probably was affected by the district court's conclusion that the Tribe had lost its hunting and fishing rights within the taken areas since the court refused to grant summary judgment on the issue of jurisdiction over hunting and fishing within the exterior boundaries of the reservation outside the taken areas. Under these circumstances, we believe that a remand is appropriate in order to permit the district court to make the necessary particularized inquiry into the state, federal and tribal interests at stake to determine who possesses jurisdiction to regulate hunting and fishing by nonmembers of the Tribe within the Fort Randall and Big Bend taking areas. See New Mexico v. Mescalero Apache Tribe, supra, --- U.S. at ----, 103 S.Ct. at 2381; Montana v. United States, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981); White Mountain Apache Tribe v. Bracker, supra, 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665.
 
 V.
 CONCLUSION
 
 75
 For the above-stated reasons, the district court's judgment is reversed and this matter is remanded for further proceedings consistent with this opinion.
 
 
 
 *
 The Honorable PAUL A. MAGNUSON, United States District Judge for the District of Minnesota, sitting by designation
 
 
 [1]
 The seven taking statutes passed by Congress in order to construct the dams within the Missouri River Basin Project were the Fort Berthold Garrison Act, Pub.L. No. 81-437, 63 Stat. 1026 (1949); Cheyenne River Oahe Act, Pub.L. No. 83-776, 68 Stat. 1191 (1954); Standing Rock Oahe Act, Pub.L. No. 85-915, 72 Stat. 1762 (1958); Fort Randall (Crow Creek) Act, Pub.L. No. 85-916, 72 Stat. 1766 (1958); Fort Randall (Lower Brule) Act, Pub.L. No. 85-923, 72 Stat. 1773 (1958); Big Bend (Lower Brule) Act, Pub.L. No. 87-734, 76 Stat. 698 (1962); and Big Bend (Crow Creek) Act, Pub.L. No. 87-735, 76 Stat. 704 (1962)
 
 
 [2]
 The district court reserved ruling upon the parties' cross motions for summary judgment concerning jurisdictional control of hunting and fishing on the Lower Brule Reservation outside the Fort Randall and Big Bend taking areas. This matter is still pending in the district court
 
 
 [3]
 In United States v. Dupris, 612 F.2d 319, 320 n. 3 (8th Cir.1979), vacated and remanded for consideration of mootness, 446 U.S. 980, 100 S.Ct. 2959, 64 L.Ed.2d 836 (1980), prosecution dismissed on motion of the government, 664 F.2d 169 (8th Cir.1981), we explained:
 For the sake of clarity, we note that the question whether the boundaries of an Indian reservation, as drawn when the reservation was established, are redrawn after part of that reservation has been opened for settlement, has been expressed in several different ways by various courts. The process has been called disestablishment (referring to the disestablishment of the original reservation boundaries); diminishment (referring to a diminishing or shrinking of the original boundaries); termination of reservation status (if the original boundaries are redrawn, the reservation status of the land is no longer within the boundaries and thus is terminated); and a change of boundaries.
 
 
 [4]
 See Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977), aff'g, 521 F.2d 87 (8th Cir.1975); DeCoteau v. District County Court, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975); Mattz v. Arnett, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973); Seymour v. Superintendent, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962); United States v. Dupris, supra, 612 F.2d at 319; United States v. Wounded Knee, 596 F.2d 790 (8th Cir.), cert. denied, 442 U.S. 921, 99 S.Ct. 2847, 61 L.Ed.2d 289 (1979); United States v. Long Elk, 565 F.2d 1032 (8th Cir.1977); United States ex rel. Cook v. Parkinson, 525 F.2d 120 (8th Cir.1975), cert. denied, 430 U.S. 982, 97 S.Ct. 1677, 52 L.Ed.2d 376 (1977); United States ex rel. Condon v. Erickson, 478 F.2d 684 (8th Cir.1973); City of New Town, North Dakota v. United States, 454 F.2d 121 (8th Cir.1972)
 
 
 [5]
 In United States v. Wounded Knee, supra, 596 F.2d at 791-792, the defendants were convicted of committing rape within "Indian country" in violation of 18 U.S.C. §§ 1153 & 2031. On appeal, they contended that the district court lacked subject matter jurisdiction because the offenses had not occurred within "Indian country." Specifically, they argued that the rape occurred on land taken from the Crow Creek Sioux Reservation by the Crow Creek Big Bend Act, Pub.L. No. 87-735, 76 Stat. at 704 which disestablished the reservation's boundaries
 
 
 [6]
 The Lower Brule Sioux Reservation and Crow Creek Sioux Reservation are located on opposite sides of the Missouri River: the former is to the south and west of the river, and the latter is to the north and west. Congress authorized the taking of land from both reservations in separate, but virtually identical, statutes which were passed on the same day. See note 1, supra
 
 
 [7]
 In Rosebud Sioux Tribe v. Kneip, supra, 430 U.S. at 584, 97 S.Ct. at 1362 and DeCoteau v. District County Court, supra, 420 U.S. at 425, 95 S.Ct. at 1084, the Supreme Court held that the Rosebud and Lake Traverse Reservations, respectively, were disestablished by statutes opening "surplus lands" to non-Indian settlement on portions of the reservations. The Court found in both cases that in light of clear legislative history and surrounding circumstances, the language of the statutes in question was "precisely suited" to the purpose of disestablishment
 
 
 [8]
 In Mattz v. Arnett, supra, 412 U.S. at 504 & n. 22, 93 S.Ct. at 2258 & n. 22, the Supreme Court cited the following as examples of "clear language of express termination:" "the Smith River Reservation is hereby discontinued," 15 Stat. 221 (1868); "the same being a portion of the Colville Indian Reservation * * * is hereby vacated and restored to public domain," 27 Stat. 63 (1892); and "the reservation lines of the said Ponca and Otoe and Missouri Indian reservations be, and the same are hereby abolished," 33 Stat. 218 (1904)
 
 
 [9]
 In Wounded Knee, the Crow Creek Tribe provided exclusive regulation of the taken land. United States v. Wounded Knee, supra, 596 F.2d at 795. The record in this case shows that South Dakota has established a wildlife refuge and attempted to enforce its hunting and fishing regulations on the land taken from the Lower Brule Sioux. This evidence of at least some exercise of concurrent jurisdiction by the Indians and the state does not alter our conclusion that the jurisdictional history of the land taken by the Big Bend Act militates against a finding of disestablishment. The Supreme Court generally has relied on jurisdictional history to support its finding that congressional legislation disestablished a reservation only when the Indians exercised no jurisdiction over the land in question after the statute was enacted. See Rosebud Sioux Tribe v. Kneip, supra, 430 U.S. at 603, 97 S.Ct. at 1371; DeCoteau v. District County Court, supra 420 U.S. at 442-443, 95 S.Ct. at 1091-1092
 
 
 [10]
 In sharp contrast to the Big Bend Act, the legislative histories and surrounding circumstances of the statutes involved in Rosebud and DeCoteau demonstrate a clear congressional intent to disestablish reservation boundaries. In those two cases the Supreme Court emphasized the "familiar forces" which accompanied the passage of the statutes in question: A nearby and growing population of whites was urging authorities to open the reservation to general settlement, and the Indians, suffering from illness and poor harvests, were developing an increasing need for cash and direct assistance. Partially as a result of these forces, Congress passed the General Allotment Act of 1887 which empowered the President to allot portions of reservation land to tribal members and, with tribal consent, to sell surplus lands to non-Indian settlers, with the proceeds from these sales being dedicated to the Indians' benefit. Against this background, negotiations took place with the objective of opening the reservations to settlement. Subsequent to the enactment of the statutes opening reservation land, state jurisdiction over the ceded land went virtually unquestioned. The Supreme Court, in both Rosebud and DeCoteau, found that these surrounding circumstances, along with the clear legislative histories of the "surplus land" statutes in question, supported a finding that Congress intended to disestablish the reservations. Rosebud Sioux Tribe v. Kneip, supra, 430 U.S. at 589-615, 97 S.Ct. at 1364-1378; DeCoteau v. District County Court, supra, 420 U.S. at 431-449, 95 S.Ct. at 1086-1095
 
 
 [11]
 As with the Big Bend Acts, Congress enacted separate, but virtually identical, Fort Randall Acts to authorize the acquisition of land from the Crow Creek and Lower Brule sides of the Missouri River. The Wounded Knee Court discussed the land taken from the Crow Creek Reservation rather than from the Lower Brule Reservation on the opposite side of the river. United States v. Wounded Knee, supra, 596 F.2d at 792-795
 
 
 [12]
 The United States Attorney obviously was concerned with preserving his conviction and argued to support federal jurisdiction that the absence of "as diminished" in the Big Bend Act carried great significance. The defendant, by arguing that the Fort Randall Act had disestablished the reservation, was enabled to make the "ingenious argument" that Congress had a similar intention with respect to the Big Bend taking area. United States v. Wounded Knee, supra, 596 F.2d at 793
 
 
 [13]
 In distinguishing the Fort Randall Act from Big Bend Act, the district court relied in part on the inclusion of three sections in the Big Bend Act which referred to its taking area as "within" or "on" the reservation, and the omission of those sections in the earlier Fort Randall Act. Specifically, the court referred to section 1(a) ("bed of the Missouri River * * * within the boundaries of the reservation"); section 9 (removal of timber and improvements "on the reservation"); and section 12 (expenses incurred due to "taking of Indian lands within the reservation") of the Big Bend Act. The importance of this contrast is questionable when the 1958 Standing Rock Oahe Act is considered. Pub.L. No. 85-915, 72 Stat. at 1762. The Oahe Dam is another one of the dams of the Missouri River Basin Project, and its enabling act, which contains the words "as diminished" in Section 11, also contains two of the three "within the reservation" references discussed by the district court. Pub.L. No. 85-915, § 1, 72 Stat. at 1762 (riverbed); Pub.L. No. 85-915, § 13, 72 Stat. at 1765 (expenses). Thus, a more plausible explanation for the different wording in the Big Bend and Fort Randall Acts is the different format of the Fort Randall Act, coupled with a simple difference in drafting style
 
 
 [14]
 The Act of July 6, 1954, Pub.L. No. 83-478, 68 Stat. 452 (1954), began the process of constructing the Fort Randall Dam and Reservation Project. After it was enacted, the Corps of Engineers initiated an eminent domain proceeding to acquire the land necessary for the Fort Randall project. In 1958, Congress enacted the Fort Randall Act directly at issue here to provide the Lower Brule Sioux with compensation for the reservation land taken in addition to that awarded by the federal district court in the earlier eminent domain proceeding
 
 
 [15]
 The questions of whether Congress has abrogated Indian treaty rights or has authorized states to apply their laws to Indian conduct on reservation land are not always a single issue. In this case, however, the two questions present a single issue because the treaty right involved is the right to hunt and fish free of state regulation. For convenience, we will discuss the issue in terms of abrogation
 
 
 [16]
 The district court also held that the Flood Control Act of 1944 did not abrogate any of the treaty rights of the Lower Brule Tribe or its members. We agree with this holding. It is fully consistent with this Court's decisions in United States v. Winnebago Tribe of Nebraska, 542 F.2d 1002 (8th Cir.1976) (1944 Flood Control Act did not abrogate the Tribe's treaty right to exclusively own and occupy reservation land), and United States v. White, 508 F.2d 453 (8th Cir.1974) (federal statute prohibiting the taking of bald eagles did not abrogate tribal members' treaty right to hunt on reservation land)
 
 
 [17]
 The Lower Brule Tribe does not appeal from the district court's finding that the Fort Randall and Big Bend Acts abrogated its treaty right to exclusive occupation and use of the taken areas
 
 
 [18]
 Specifically, the district court relied on a House Report from the Big Bend Act which stated: "The principal purposes * * * are to reimburse individual Indian[s] * * * and the * * * Tribe * * * for the trust lands acquired * * * [and] to compensate the tribe and its members for treaty and tribal damages * * *." H.Rep. No. 852, 87th Cong., 1st Sess. 6 (Aug. 5, 1961) (emphasis added)
 The district court also pointed to a House Report from the Fort Randall Act which stated:
 The Lower Brule and Crow Creek Reservations include approximately 10,158 acres in the bed of the Missouri River * * *. The committee deemed it in the overall interest that this acreage be removed from tribal ownership to prevent jurisdictional disputes and conflicts which would arise from exercise of treaty rights.
 H.Rep. No. 2054, 85th Cong., 2d Sess. at 4 (June 30, 1958).
 
 
 [19]
 In addition, with respect to the second House Report relied upon by the district court, see note 18, supra, the court obviously assumed that the "jurisdictional disputes" referred to were between the Tribe and the state. It is more likely, however, that Congress was concerned about jurisdictional disputes between the Tribe and the Corps of Engineers. This latter problem theoretically could be removed by federal ownership of the riverbed and express provisions concerning federal authority. It is difficult to understand how federal ownership of the riverbed would diminish the possibility of jurisdictional disputes between the Tribe and the states. This reading is buttressed by House Report No. 852, in which the committee stated that the riverbed was to be acquired from the Indians "to prevent jurisdictional disputes and to insure complete control of the project." H.Rep. No. 852, supra, at 9 (emphasis added). The "complete control" contemplated by the committee obviously would be by the federal government
 
 
 [20]
 For example, in House Report No. 852, officials of the Army Corps of Engineers opposed uncontrolled Indian hunting and fishing in the Big Bend taking area and suggested that the state regulate these activities. H.Rep. No. 852, supra, at 17-18, 31. On the other hand, although it is well settled that Indians must be compensated for treaty rights abrogated by Congress, the legislative histories of the Big Bend and Fort Randall Acts indicate that the Lower Brule Sioux received no payment for the loss of hunting and fishing rights. See H.Rep. No. 852, supra, at 9-10 (Big Bend Act); S.Rep. No. 2369, 85th Cong., 2d Sess. 3 (Aug. 14, 1958), and H.Rep. No. 2054, supra, at 3 (Fort Randall Act)
 Another example is contained in Senate Report No. 2369, in a discussion of what ultimately became Section 5 of the Fort Randall Act. The Report proposed to include the following provision in the Act:
 [S]aid tribal council and the members of said Indian tribe shall be permitted to have, without cost, access to the shoreline of the reservoir including permission to hunt and fish in and on the aforesaid shoreline and reservoir, subject, however, to regulations *governing the corresponding use by other citizens of the United States.*
 S.Rep. No. 2369, supra, at 13.
 This language is identical to that in the final statute. The asterisks are accompanied by a footnote:
 The tribe wants the language between * and * to read "agreed on by the tribal council and the Chief of Engineers, United States Army." That language would leave hunting and fishing unregulated in the event of a failure to agree on regulations.
 Id.
 It is likely that the Lower Brule Tribe and the government viewed the phrase "regulations governing the corresponding use" to refer to regulations by the Corps of Engineers, not by the state, and that the only dispute concerned the Tribe's ability to veto Corps regulations.
 
 
 [21]
 The 1944 Act's legislative history plainly indicates that it was enacted in response to two critical national needs. First, Congress believed that a comprehensive federal solution was required to avoid widespread and damaging floods in several of the major river basins of the nation, such as those experienced in 1942 and 1943. H.Rep. No. 1309, 78th Cong., 2d Sess. 3 (Mar. 29, 1944), U.S.Code Cong.Serv. 1944, p. 1349. Second, Congress believed that the development of a comprehensive flood control system would provide federal public service jobs for "employing the returning soldiers [from World War II] on useful and meritorious work." Id. at 4, U.S.Code Cong.Serv. 1944, p. 1352
 
 
 [22]
 Section 4 of the 1944 Act began:
 The Chief of Engineers, under the supervision of the Secretary of War, is authorized to construct, maintain, and operate public park and recreational facilities in reservoir areas under the control of the War Department, and to permit the construction, maintenance, and operation of such facilities [emphasis added].
 Pub.L. No. 78-534, § 4, 58 Stat. 887, 889-890 (1944) (codified as amended at 16 U.S.C. § 460d (1976)).
 
 
 [23]
 Section 4 of the 1944 Act stated in part:
 The water areas of all such reservoirs shall be open to public use generally, without charge, for boating, swimming, bathing, fishing, and other recreational purposes, and ready access to and exit from such water areas along the shores of such reservoirs shall be maintained for general public use, when such use is determined by the Secretary of War not to be contrary to the public interest, all under such rules and regulations as the Secretary of War may deem necessary. No use of any area to which this section applies shall be permitted which is inconsistent with the laws for the protection of fish and game of the state in which such area is situated [emphasis added].
 Id.
 The district court concluded that the last sentence quoted above authorized South Dakota to apply its laws to hunting and fishing activities by tribal members within the Fort Randall and Big Bend taking areas. We cannot agree with this conclusion. It is inconsistent with the district court's correct determination that the 1944 Flood Control Act did not abrogate the treaty hunting and fishing rights of the Lower Brule Sioux. See note 16, supra. The "inconsistent use" sentence of section 4 cannot be viewed in isolation. Read as a whole, the 1944 Act envisions a scheme of federal--not state--regulation over flood control projects. See slip op., supra, at 825 & nn. 21-23. See also H.Rep. No. 1309, supra at 5, U.S.Code Cong.Serv. 1944, p. 1353 ("The Congress and the country are agreed that the planning and execution of flood-control projects should be a function of the Corps of Engineers of the United States Army"); 90 Cong.Rec. 4130 (May 8, 1944) ("This bill lays down the principle that all reservoirs constructed with Federal funds * * * shall be operated under the regulations of the War Department. This is common sense."). Moreover, both the text of section 4 and its preamble expressly state that the regulation contemplated by Congress would be federal. See notes 22 & 23, supra. Finally, there is simply no indication in the legislative history that Congress even considered Indian rights when it adopted section 4. Under these circumstances, we believe that the "inconsistent use" sentence in section 4 means only that the Secretary of the Army cannot promulgate regulations regarding recreational activities by the "general public" within "public park and recreation facilities" which contravene state conservation laws. It does not authorize South Dakota to apply its laws to hunting and fishing activities by the Lower Brule Sioux on their reservation within the Fort Randall and Big Bend taking areas. If Congress had intended this latter result, it was "incumbent upon [it] to expressly" do so. United States v. White, supra, 508 F.2d at 457.
 The "inconsistent use" provision in section 4, however, might well be relevant to the issue of whether the Tribe or the state has jurisdiction to regulate hunting and fishing by nonmembers of the Tribe within the Fort Randall and Big Bend taking areas. See New Mexico v. Mescalero Apache Tribe, --- U.S. ----, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983); Montana v. United States, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981); White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980). Because we remand this issue to the district court, see infra, at 827-828, we need not here determine the relevance of section 4 to the question of jurisdiction over nonmembers of the Tribe.
 
 
 [24]
 For example, in concluding that South Dakota possesses exclusive jurisdiction to regulate hunting and fishing by tribal members within the taken areas, the district court stated:
 In summary, this Court is well aware of general principles in Indian law which properly limit the reach of state authority in Indian country. But Wounded Knee compels the conclusion that Congress changed the reservation to an area without defined or identifiable boundaries. To avoid the corresponding jurisdictional confusion over hunting and fishing, Congress provided that tribal hunting and fishing rights, within the entire taken area, were subject to the same regulations which govern the corresponding use of other citizens of the United States [emphasis included].