### LOWER BRULE SIOUX TRIBE, Plaintiff,

v.

### STATE OF SOUTH DAKOTA, and John Cooper, Secretary, Division of Game, Fish and Parks for the State of South Dakota, Defendants.

Civ. 91–3036.

United States District Court,
D. South Dakota,
Western Division.

Feb. 8, 1996.

See also 540 F.Supp. 276 and 711 F.2d 809.

R. Dennis Ickes, Nielsen & Senior, Salt Lake City, UT, Julian H. Brown, Pierre, SD, for plaintiff.

John P. Guhin, John E. Haak, Attorney General's Office, Pierre, SD, for defendant.

MEMORANDUM OPINION GRANTING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

BATTEY, Chief Judge.

## TABLE OF CONTENTS

NATURE AND PROCEDURAL HISTORY ..................................... 1439

FACTS .............................................................. 1440

SUMMARY JUDGMENT STANDARD ........................................ 1443

DISCUSSION ........................................................ 1443
 A. INDIAN SOVEREIGNTY ........................................ 1443
 B. JURISDICTION OVER FEE LANDS AND WATERS ................. 1444
 1. Legal Precedent........................................ 1444
 2. Treaty Rights ......................................... 1446
 3. Inherent Sovereignty .................................. 1447
 a. The First Montana Exception ...................... 1447
 b. The Second Montana Exception ..................... 1447
 4. State Jurisdiction .................................... 1449
 C. JURISDICTION OVER TAKEN AREA LANDS AND WATERS ........ 1452
 1. Legal Precedent........................................ 1452
 2. Treaty Rights ......................................... 1453

3. Inherent Sovereignty ........................................... 1454
 a. The First Montana Exception ................................. 1454
 b. The Second Montana Exception ............................... 1454
4. State Jurisdiction............................................ 1455

CONCLUSION ................................................. —

## NATURE AND PROCEDURAL HISTORY

This litigation was first commenced on August 4, 1980, when the Lower Brule Sioux Tribe (hereinafter "Tribe") filed suit against the State of South Dakota and the acting Secretary of Game, Fish, and Parks (hereinafter "State"). The Tribe sought both injunctive relief and a declaration of the rights of the parties with respect to the enforcement of hunting and fishing laws as to Indians and non-Indians within the exterior boundaries of the Lower Brule Sioux Reservation (hereinafter "Reservation"). On cross motions for summary judgment, the Court reserved ruling on matters pertaining to the land outside the Fort Randall[1] and Big Bend[2] taken areas, but did hold that the State had exclusive jurisdiction to regulate hunting and fishing by all persons on the land within said taken areas. *Lower Brule Sioux Tribe v. South Dakota*, 540 F.Supp. 276, 292 (D.S.D.1982) (Bogue, J.). The Eighth Circuit Court of Appeals reversed the trial court's holding as it pertained to the regulation of tribal members, concluding that the Tribe possessed exclusive jurisdiction to regulate hunting and fishing by tribal members in the taken areas and remanded the case for a redetermination as to the regulation of nonmember Indians within the taken areas. *Lower Brule Sioux Tribe v. South Dakota*, 711 F.2d 809, 813 (8th Cir.1983).

On October 24, 1986, the parties entered into a Memorandum of Agreement,[3] thereby obviating any necessity for further hearing on remand. This five-year agreement expired on October 23, 1991. The parties did not agree on an extension or modification of the agreement; accordingly, the Tribe commenced this action on October 24, 1991. The issues presented involve a determination of

---

1. *See generally* Fort Randall Taking Act, Pub.L. No. 85–923, 72 Stat. 1773 (1958) (providing compensation to the Tribe and its members for the land acquired to construct the Fort Randall Dam and Reservoir Project).

2. *See generally* Big Bend Taking Act, Pub.L. No. 87–734, 76 Stat. 698 (1962) (authorizing the acquisition of and payment for tribal and trust lands on the Lower Brule Reservation for the Big Bend Dam and Reservoir Project).

3. This Memorandum of Agreement provided that: (1) the Tribe would manage all game populations, including the setting of seasons, issuance of license and conducting of hunting seasons within the boundaries of the Indian Reservation; (2) any person hunting within the Reservation boundaries must be licensed in accordance with tribal regulations; (3) nonmembers of the Tribe need not purchase the state licenses when hunting on the Reservation; (4) nonmembers may hunt waterfowl on the Missouri River and shoreline area with only the state license and federal duck stamp; (5) nonmembers of the Tribe hunting migratory waterfowl on the Reservation must also be in possession of a federal migratory bird hunting stamp (duck stamp); (6) the State will manage the fisheries in the Missouri River on and adjoining the Reservation; (7) nonmembers of the Tribe must purchase the required state fishing license to fish in the Missouri River without the requirement to purchase the tribal permit; (8) tribal members may fish in those waters with only the tribal permits, but must abide by the seasons, bag limits, and methods established for nonmembers; (9) the Tribe agrees to allow access to and from these waters by nonmembers through the public roads and access areas without charge.

Additionally, the parties agreed to continue to cooperate, develop, and improve the fish and wildlife resources on the Reservation by prohibiting the use of gill or trammel nets, requiring the use of steel shot in the hunting of migratory waterfowl in accordance with the state non-toxic shot implementation schedule and prohibiting the sale of fish or game or other such practices that would be detrimental to game and fish resources. The agreement further provided for an active enforcement of the prohibitions contained within the agreement and cross-deputization of tribal and state law enforcement officers for the purpose of carrying into effect the intent and purposes of the agreement. The parties essentially followed the agreement in all of its terms with the exception that the Tribe unilaterally decided and followed a policy of not requiring tribal licenses for those nonmember persons hunting on land that such nonmembers either owned or leased (fee lands).

the respective authority of the State and the Tribe as to the regulation of hunting and fishing by nonmember Indians and non-Indians on fee lands and Corps lands within the exterior boundaries of the Reservation.[4] It is important to understand what this decision does not concern. It is not about State regulation of tribal members on any land within the exterior boundaries of the Reservation.

The Court held an evidentiary hearing on November 8, 1991, on the issue of preliminary injunctive relief. It issued its preliminary injunction continuing the terms of the 1986 agreement. Before the Court could hold a hearing on permanent injunctive relief, it removed the case from its trial calender, staying the action pending the final resolution of *South Dakota v. Bourland*, 949 F.2d 984 (8th Cir.1991) (*Bourland II*), a case involving similar issues affecting the Cheyenne River Sioux Tribe. The issue in *Bourland II* was whether the Cheyenne River Sioux Tribe, located further upstream on the Missouri River, had authority to regulate non-Indian hunting and fishing on lands within the boundaries of its reservation. This land was taken by the United States for the construction and operation of the Oahe Dam and Reservoir, a flood control project of the United States Army Corps of Engineers. *Bourland II* was decided by the Eighth Circuit on November 21, 1991. When the Supreme Court granted certiorari, this Court continued its stay. The Supreme Court issued its decision on June 14, 1993.[5] Finally, upon remand, the Eighth Circuit Court of Appeals resolved the remaining issues presented by *Bourland III*.[6]

On September 11, 1995, this case proceeded. The State filed a motion for summary judgment requesting the Court to find that the State has exclusive jurisdiction over nonmember Indians and non-Indians hunting and fishing on the lands and waters within the boundaries of the Reservation and within the Fort Randall and Big Bend taken areas, as well as the lands and waters owned in fee

by any nonmember Indian. Appropriate responses have been filed. Accordingly, this Court has jurisdiction under 28 U.S.C. § 1362.

### FACTS

Congress established the boundaries of the Great Sioux Nation in the Fort Laramie Treaty of 1851, 11 Stat. 749 (1851), and 1868, 15 Stat. 635 (1868). *See United States v. Sioux Nation of Indians*, 448 U.S. 371, 374–77, 100 S.Ct. 2716, 2720–21, 65 L.Ed.2d 844 (1980). The Lower Brule Sioux Reservation was created by act of Congress on March 2, 1889, 25 Stat. 888, which divided the Great Sioux Nation and described the Reservation boundaries. The present day Reservation is centrally located in South Dakota, bounded on the northeast and east by the Missouri River. It is located in the northeastern two-thirds of Lyman County, with a small portion in the southeastern corner of Stanley County. The northwestern corner of the Reservation is approximately 15 miles southeast of Pierre, South Dakota, the state capital. The southeastern corner of the Reservation is approximately eight miles northwest of Chamberlain, which is north of United States Interstate 90. The Reservation is served by state highway 47 and state highway 1806 which traverses the Reservation generally following the course of the Missouri River. The Reservation community of Lower Brule is located approximately eight miles northwest of Big Bend Dam, a large earthen dam spanning the river, creating Lake Sharp. The Fort Randall Dam, located at Pickstown, is a large mainstream dam which backs water several miles upstream, as far as the Big Bend Dam. The Fort Randall Dam created Lake Francis Case.

Pursuant to the Indian Reorganization Act of 1934, the Tribe was incorporated and its constitution approved by the Secretary of Interior on November 27, 1935. Act of June 18, 1934, 48 Stat. 984, (as amended by the

---

4. Fee lands are lands owned "in fee" (individual ownership) by either nonmembers or members of the Reservation either resident or non-resident. Corps lands are lands taken for construction of the Big Bend and Fort Randall dams across the Missouri River.

5. *South Dakota v. Bourland*, 508 U.S. 679, 113 S.Ct. 2309, 124 L.Ed.2d 606 (1993), *rev'g* 949 F.2d 984 (8th Cir.1991) (*Bourland III*).

6. *South Dakota v. Bourland*, 39 F.3d 868 (8th Cir.1994) (*Bourland IV*).

Act of June 15, 1935 (Pub.L. No. 74–147)). The Tribe's membership consists of all persons of Indian blood whose names appeared on the tribal roll as of April 1, 1935, including all children born to any such member resident of the Reservation at the time of their birth. The membership also includes children born to any member after the effective date of the tribal constitution and possessing at least one-fourth degree Lower Brule Indian blood regardless of the residence of the parents at the time of their birth. The Tribe's population as of the 1983 census was 1,035 resident Indians, with a total tribal enrollment of 1,791. Approximately 10 percent of the residents on the Reservation are nonmembers, consisting principally of employees of the BIA Indian Health Service and nonmember ranchers living on the Reservation.

This litigation involves two separate land classifications within the Reservation—fee land and taken area land. The first class of land is fee lands owned by either members or nonmembers and acquired through the process of allotment. The General Allotment Act of 1887 effectuated the congressional policy of forcing Indian tribes to assimilate into the white culture by authorizing the issuance of fee patents to individual tribal members. Dawes General Allotment Act, 24 Stat. 388 (1887), (codified as amended at 25 U.S.C. § 331 et seq.). Section 5 of the Act contemplated that "surplus" land which was not required for the fixed-acreage allotments to tribal members would eventually be opened to non-Indian settlement under the public lands program. *See* Robert N. Clinton et al., *American Indian Law* 146–52 (3d ed. 1991). Legislation aimed at opening the Reservation to non-Indian development was enacted in 1899, 30 Stat. 1362, and in 1906, 34 Stat. 124. The piecemeal sale of Indian lands up to the time of the Indian Reorganization Act of 1934 has created what is often referred to as a "checkerboard" map of trust and tribal lands, allotted lands,[7] and fee lands.

The original area of the Reservation which was approximately 446,500 acres has been diminished to the present size of approximately 235,800 acres. Of the 235,800 acres within the Reservation boundaries, only 119,-900 acres remain in Indian ownership for Indian use. The 119,900 acres remaining in Indian ownership for Indian use may be further categorized as follows: 76,700 is in tribal trust; 30,000 acres are allotted lands; and 13,200 acres the government owns for Indian use. Indian ownership lands consist of 112,-000 acres of open grazing; 400 acres noncommercial timber; 6,900 acres dry farm; 400 acres irrigated; and 200 acres as non-agriculture. Approximately one-quarter of the Reservation, 56,634 acres, is deeded land held in fee. The boundaries between fee lands, trust lands, tribal lands, and allotted lands are not marked by boundary markers, making it difficult for persons entering the Reservation to determine the ownership of the checkerboard tracts of land. Furthermore, the wildlife herds migrate from and across all of such land, thereby creating different problems for law enforcement. The Court does note that the Tribe has reacquired certain lands and continues to pursue such a policy. *See South Dakota v. United States Dep't of Interior,* 69 F.3d 878 (8th Cir.1995) (concerning the Lower Brule Sioux Tribe's attempted acquisition and placement of land into trust status).

The second land class at issue in this case is land referred to as taken lands acquired for construction of the Big Bend and Fort Randall dams spanning the Missouri River. In order to prevent flooding of the lower Missouri River basin, Congress enacted the Flood Control Act of 1944, Pub.L. No. 78–534, 58 Stat. 887 (codified as amended at 16 U.S.C. § 460d (1993)), which authorized the establishment of a comprehensive flood control plan for the Missouri River. Seven subsequent congressional enactments authorized limited takings of Indian lands for hydroelectric and flood control dams on the Missouri River. *See Lower Brule,* 711 F.2d at 813 n. 1. This case involves the taken areas created by two of these Acts—the Fort Randall Taking Act, Pub.L. No. 85–923, 72 Stat. 1773 (1958) and the Big Bend Taking Act, Pub.L.

---

7. Allotted lands are lands acquired by Indians pursuant to the General Allotment Act, 24 Stat. 388 (1887) (codified as amended at 25 U.S.C.

§ 334 *et seq.*). Certain allotted lands may continue to remain in trust status.

No. 87–734, 76 Stat. 698 (1962). The Fort Randall Act provided compensation to the Tribe and individual Indian land owners for the lands acquired for the Fort Randall Dam and Reservoir Project. The Big Bend Act provided for the acquisition of and compensation for individual Indian and tribal lands required for the Big Bend Dam and Reservoir Project. The construction of the Fort Randall and Big Bend Dams on the Missouri River (1946–64) required the taking of 22,296 acres of Indian lands. The construction of the dams required 69 percent of the Reservation Indian families to be relocated to higher ground.

In 1961 the Tribe adopted a Game and Fish Management Code which required non-Indians to abide by tribal game and fish regulations, as well as the laws of the state of South Dakota. On June 2, 1982, the Tribe adopted the Wildlife Management Code of 1982 in order to provide for the management and control of wildlife, fishery, and outdoor recreation resources of the Reservation. At that time, the Tribe intended that the hunting and fishing laws of the State would not be applicable to the territory within the exterior boundaries of the Reservation as to either tribal members or non-tribal members. This extensive Code specifically addressed all lands within the exterior boundaries of the Reservation. The Code provides for the propagation, conservation, management, distribution, transportation, storage, and taking of fish and game, relating to the management, conservation, and control of Reservation lands, forests, and waters for fish and game purposes. The Code further regulated fishing, hunting, trapping, timbering, selling, bartering, and exchange of fish, game, timber, and timber products. It included regulation of boats, snowmobiles, and other off-the-road recreational vehicles, as well as outdoor recreational activities.

On occasion the Tribe and the State have adopted conflicting hunting and fishing regulations, creating confusion and tension. *See Lower Brule*, 711 F.2d at 814 (providing an example of conflicting regulations pertaining to the use of lead or other toxic shot for hunting water fowl). The Tribe did not enforce its regulations on the Missouri River during the period of the 1986 agreement with the State; however, prior to the 1986 agreement the Tribe did require a tribal hunting license within the taken areas. As early as May 3, 1973, the Tribe, acting in cooperation with the Bureau of Indian Affairs (BIA) and the Bureau of Sport Fisheries and Wildlife, organized the Lower Brule Department of Outdoor Recreation to promote and develop the wildlife, recreational, and natural resources of the Reservation.

Since 1980 the Tribe has contracted on several occasions with the BIA for the purpose of wildlife and fish management. The Tribe currently manages its fish and wildlife enterprises through the "Lower Brule Wildlife Enterprise" (Wildlife Enterprise). This enterprise was established by the Lower Brule Tribal Council on January 11, 1989, as a successor to the Lower Brule Department of Outdoor Recreation. The original purpose of Wildlife Enterprise was to reorganize the wildlife department to include a board of directors, establish program policy and direction, and conduct all of those responsibilities that pertain to budgeting, personnel, programs, and the supervision of such matters. Wildlife Enterprise is governed by a seven-person board of directors consisting of both members and nonmembers. The State has also played an active role in both the management and enhancement of Reservation wildlife and fisheries. The State's involvement, as is the case with the Tribe, is largely pursuant to contracts and grants from the federal government. A *de minimus* amount of State revenues have been utilized for management and enhancement programs on the Reservation.

The Tribe has actively and aggressively attempted to develop its recreational opportunities by the printing and distribution of various advertising brochures. Recreation associated with wildlife generates substantial year-round revenue and Reservation activity. Both parties agree that tribal programs such as a scenic byway, wildlife viewing area, living history reenactment, commercial buffalo operation, marina, and arts and crafts program development play an important economic role on the Reservation. Both the State and the Tribe seek to derive income

from non-Indians and nonmember Indians through fees and licenses arising from hunting and fishing on the fee lands and the taken lands; however, only nine cents of every dollar spent by sportsmen on the Reservation is derived from license fees.

## SUMMARY JUDGMENT STANDARD

■ Under Rule 56 of the Federal Rules of Civil Procedure, a movant is entitled to summary judgment if the movant can "show that there is no genuine issue as to any material fact and that [the movant] is entitled to judgment as a matter of law." *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458, 488 (1962). In determining whether summary judgment should issue, the facts and inferences from those facts are viewed in the light most favorable to the nonmoving party and the burden is placed on the moving party to establish both the absence of a genuine issue of material fact and that such party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–90, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986). Once the moving party has met this burden, the nonmoving party may not rest on the allegations in the pleadings, but by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists.

■ In determining whether a genuine issue of material fact exists, the Court views the evidence presented based upon which party has the burden of proof under the underlying substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253–55, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Recently, the Supreme Court noted that "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). The nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586,

106 S.Ct. at 1356, and "[w]here the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.*

The trilogy of *Celotex, Anderson,* and *Matsushita* provide the Court with a methodology in analyzing the State's motion. *See generally* 1 Steven A. Childress & Martha S. Davis, *Federal Standards of Review* § 5.04 (2d ed. 1991) (discussing the standards for granting summary judgment that have emerged from *Matsushita, Celotex,* and *Anderson* ). Under this trilogy, it is incumbent upon the Tribe, based upon the showing set forth by the State, to establish significant probative evidence to prevent summary judgment. *See Terry A. Lambert Plumbing, Inc. v. Western Sec. Bank*, 934 F.2d 976, 979 (8th Cir.1991).

## DISCUSSION

This case presents three major issues: (1) whether or not a distinction should be drawn between nonmember Indians and non-Indians in the context of civil regulation of hunting and fishing; (2) whether or not the State has exclusive jurisdiction over nonmember Indians and non-Indians on lands and waters owned in fee by nonmembers within the boundaries of the Reservation; and (3) whether or not the State has exclusive jurisdiction over nonmember Indians and non-Indians on lands and waters located in the Fort Randall and Big Bend taken areas within the boundaries of the Reservation.

### A. INDIAN SOVEREIGNTY

The ever recurring issues of tribal jurisdiction over non-Indians and nonmembers for activities conducted within the exterior boundaries of an Indian reservation have long concerned the courts in both civil and criminal matters. This judicial history provides the Court with a slate upon which certain of these issues have been resolved.

■ It is well established that "Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory." *United States v. Mazurie*, 419 U.S. 544, 557, 95 S.Ct. 710, 717, 42 L.Ed.2d 706 (1975) (citing *Worcester v.*

*Georgia*, 6 Pet. 515, 557, 8 L.Ed. 483 (1832)). *See also United States v. Wheeler*, 435 U.S. 313, 322, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978); *Montana v. United States*, 450 U.S. 544, 564, 101 S.Ct. 1245, 1257, 67 L.Ed.2d 493 (1981). Distilling this principle in the context of civil jurisdiction, *Montana* held that Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservation, even on non-Indian fee lands. *Montana*, 450 U.S. at 564–66, 101 S.Ct. at 1258. In *Washington v. Confederated Tribes of Colville*, 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980), the Supreme Court determined that the imposition of a state tax did not "contravene the principle of tribal self-government, for the simple reason that nonmembers are not constituents of the governing Tribe. For most practical purposes those [nonmember] Indians stand on the same footing as non-Indians resident on the reservation." *Id.* at 161, 100 S.Ct. at 2085. Nonmember Indians and non-Indians share the same relation to tribal government, in that neither group can typically vote in tribal elections, participate in the tribal jury system, nor can they hold tribal office. *See Brendale v. Confederated Tribes & Bands of Yakima Indian Nation*, 492 U.S. 408, 445, 109 S.Ct. 2994, 3016, 106 L.Ed.2d 343 (1989). In the area of criminal jurisdiction, the Supreme Court in *Duro v. Reina*,[8] 495 U.S. 676, 691–93, 110 S.Ct. 2053, 2063, 109 L.Ed.2d 693 (1990), held that the tribes did not have inherent criminal jurisdiction over nonmember Indians since the "retained sovereignty of the tribe is but a recognition of certain additional authority the tribes maintain over Indians who consent to be tribal members."

**8.** *Duro v. Reina* was promptly overruled by congressional action which re-defined an "Indian" as any person who would be subject to the jurisdiction of the United States as an Indian under section 1153 of Title 18. 25 U.S.C. § 1301(2), (3), and (4).

**9.** To the contrary, the language contained in the Treaty of 1865 between the United States and the Lower Brule Sioux Indians lends itself to the determination that no distinction should be drawn between non-Indians and nonmember Indians. The Treaty of 1865 distinguishes between tribal members and nonmembers binding the Lower Brule Sioux Tribe "to discontinue for the

From this historical perspective, however, the Court is unable to find any judicial precedent, treaty right,[9] or statutory language creating a distinction between nonmember Indians and non-Indians in the context of civil regulation of hunting and fishing. In the Court's analysis of the first issue, no distinction is made between non-Indians and nonmember Indians.

## B. JURISDICTION OVER FEE LANDS AND WATERS

The second issue before this Court pertains to jurisdiction within the Reservation boundaries over nonmember Indians and non-Indians on lands and waters owned in fee by any person or entity not a member of the Tribe. The Court finds the *Bourland III*,[10] *Brendale*,[11] and *Montana*[12] trilogy to be instructive in the resolution of this issue.

### 1. Legal Precedent

In *Montana*, the Supreme Court held that the Crow Indian Tribe lacked the proper authority to regulate hunting and fishing by nonmembers on nonmember fee lands. *Montana*, 450 U.S. at 556–58, 101 S.Ct. at 1254. In its analysis, the Court identified tribal treaty rights and inherent tribal sovereignty as two sources of authority which could support a finding that a tribe had the power to regulate nonmember hunting and fishing on nonmember fee lands. *Id.* The *Montana* Court first determined that under the Fort Laramie Treaty of 1868, 15 Stat. 649 (1868), the Crow Tribe possessed the power to exclude non-Indians from reservation lands, and therefore maintained the power to regulate non-Indian use of said lands.

future all attacks upon the persons or property of other tribes, unless first assailed by them...." Treaty of October 14, 1865, 14 Stat. 699, Art. II (1865).

**10.** *South Dakota v. Bourland*, 508 U.S. 679, 113 S.Ct. 2309, 124 L.Ed.2d 606 (1993).

**11.** *Brendale v. Confederated Tribes & Bands of Yakima Indian Nation*, 492 U.S. 408, 109 S.Ct. 2994, 106 L.Ed.2d 343 (1989).

**12.** *Montana v. United States*, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981).

*Id.* at 556–59, 101 S.Ct. at 1254–55. However, the Court went on to conclude that the Crow Tribe lost the power to exclude, and with it the power to regulate, as a result of the passage of the General Allotment Act of 1887 and the Crow Allotment Act of 1920, 41 Stat. 751 (1920).[13] *Id.* at 558–59, 101 S.Ct. at 1255.

As to the second source of tribal authority, the *Montana* Court concluded that:

> [E]xercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation. Since regulation of hunting and fishing by nonmembers of a tribe on lands no longer owned by the tribe bears no clear relationship to tribal self-government or internal relations, the general principles of retained inherent sovereignty did not authorize the Crow Tribe to adopt [such hunting and fishing regulations].

*Id.* at 564–65, 101 S.Ct. at 1258 (citations omitted). The Court did set forth two exceptions to this general principle against tribal authority over nonmember Indians in the civil regulatory arena. *Id.* First, "[a] tribe may regulate ... the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Id.* Second, "[a] tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id.* As to the second *Montana* exception, a controversy has emerged as to whether the more rigid application set forth in *Brendale* should govern in the context of hunting and fishing regulation. *See Bourland IV,* 39 F.3d at 870 n. 4.

The issue addressed in *Brendale* concerned the Yakima Indian Nation's authority to impose zoning and land use laws on fee lands owned by non-Indians within the Yakima Reservation. *Brendale,* 492 U.S. at 414–18, 109 S.Ct. at 3000–01. Both lower courts and the Supreme Court treated the Yakima Reservation as divided into a "closed area" and an "open area." *Id.* at 415, 109 S.Ct. at 3000. The closed area was described as a pristine wilderness area, closed to the general public, and largely restricted to enrolled members of the Yakima Tribe. *Id.* at 415–16, 437–39, 445–47, 109 S.Ct. at 3000–01, 3012, 3016. Of the 807,000 acres comprising the closed area, only 25,000 acres were held in fee. *Id.* at 414–16, 109 S.Ct. at 3000. By contrast, the open area contained unrestricted access and approximately one-half of the land was held in fee. *Id.* The Supreme Court ultimately concluded that the Yakima Nation could exclusively zone member and nonmember fee lands within the closed area, but lacked the authority to zone nonmember fee lands within the open area. *Id.* at 428–33, 109 S.Ct. at 3007–09.[14]

In the plurality opinion by Justice White, a more stringent standard was adopted for the second *Montana* exception. According to Justice White, in order for an Indian tribe to retain jurisdiction over non-Indians pursuant to the second *Montana* exception, "[t]he impact [on tribal interests] must be *demonstrably serious* and must imperil the political integrity, the economic security, or the health and welfare of the tribe." *Brendale,*

---

**13.** The Crow Allotment Act of 1920, 41 Stat. 751, and the Allotment Acts of 1899, 30 Stat. 1362, and 1906, 34 Stat. 124, were a part of the special Allotment Acts Congress passed pursuant to the policy underlying the General Allotment Act of 1887, 24 Stat. 388. *See Montana,* 450 U.S. at 559 n. 8, 101 S.Ct. at 1255 n. 8. The Crow Allotment Act affected the Crow Tribe, while the Allotment Acts of 1899 and 1906 affected the Lower Brule Sioux Tribe.

**14.** Interestingly, Justice White noted in *Brendale* that even if a tribe demonstrates facts in support of the second *Montana* exception, the state would only be required to respect the tribal interest in exercising the state's authority. *Brendale,* 492 U.S. at 430–31, 109 S.Ct. at 3008. The tribe's only remedy would be to seek injunctive relief since the tribe would not be entitled to exercise direct authority over nonmember Indians. *Id.* This conclusion is premised on Justice White's reading of *Montana* to stand for the proposition that, "[t]he governing principle is that the tribe has no authority itself, by way of tribal ordinance or action in the tribal courts, to regulate the use of fee land." *Id.*

492 U.S. at 431, 109 S.Ct. at 3008 (emphasis added). Justice White reasoned that this heightened standard "will sufficiently protect Indian tribes while at the same time avoiding undue interference with state sovereignty and providing the certainty needed by property owners." *Id.*

Although the Supreme Court's decision in *Bourland III* is instructive as to the regulation of hunting and fishing by non-Indians on taken area lands, it logically would provide guidance in all land alienation cases including fee land cases, since the *Bourland III* Court ultimately applied "*Montana's* framework for examining the 'effect of the land alienation.' " [15] *Bourland III*, 508 U.S. at ——, 113 S.Ct. at 2318. According to *Bourland III*,

> *Montana* and *Brendale* establish that when an Indian tribe conveys ownership of its tribal lands to non-Indians, it loses any former right of absolute and exclusive use and occupation of the conveyed lands. The abrogation of this greater right, at least in the context of the type of area at issue in this case [open rather than closed lands], implies the loss of regulatory jurisdiction over the use of the land by others.

*Id.* at 508 U.S. at ——, 2316. This synopsis appears to suggest that *Brendale* and its modification to the second *Montana* exception is applicable in the resolution of cases involving the regulation of hunting and fishing rights.[16] However, this Court is somewhat troubled by the fact that in its discus-

sion of the two *Montana* exceptions, the Supreme Court in *Bourland III* failed to provide a citation to the *Brendale* decision, or even acknowledge the possible modification of the second *Montana* exception. On remand, the Eighth Circuit Court of Appeals did not apply *Brendale* in the context of hunting and fishing regulations, but concluded that the issue did not need to be resolved in light of the fact that the district court had already found against the tribe when it had applied the less rigid *Montana* standard. *Bourland IV*, 39 F.3d at 870 n. 4. Since the issues in this case may also be resolved under the less stringent second *Montana* exception, this Court also need not apply the more stringent standard set forth in *Brendale* to the facts presented in this case.[17]

*Bourland III*, *Brendale*, and *Montana* form the analytical framework for the Court's resolution of the issues in this case pertaining to jurisdiction over nonmember Indians and non-Indians on lands and waters owned in fee by any person or entity not a member of the Tribe within the boundaries of the Reservation.

### 2. Treaty Rights

■ *Bourland III*, *Brendale*, and *Montana* establish that any treaty rights obtained by the Lower Brule Sioux Tribe under the Fort Laramie Treaty of 1868 were abrogated with the passage of the General Allotment Act of 1887.[18] Therefore, the Court's analysis must turn to the general principles of

---

**15.** A close scrutiny of *Bourland III*'s case history discloses that regulation of fee lands was also at issue in the early stages of the litigation. In *Bourland II*, 949 F.2d 984 (8th Cir.1991), the Eighth Circuit Court of Appeals noted that the tribe did not appeal "the portion of the District Court's opinion holding that they do not have the authority to regulate non-Indian hunting and fishing on non-Indian fee land." *Id.* at 989 n. 11. The Eighth Circuit went on to cite *Montana* for the proposition that "the right of the Tribe to regulate non-Indian hunting and fishing on fee land acquired by non-Indians pursuant to the allotment policy has been abrogated by Congress." *Id.* at 990 (citing *Montana*, 450 U.S. at 559, 101 S.Ct. at 1255).

**16.** Furthermore, there appears to be little merit in distinguishing *Brendale* on the basis that it was a zoning law case, in light of the fact that zoning/land use regulation and hunting/fishing

regulation are both in the nature of civil regulation requiring the same *Montana* analysis.

**17.** Perhaps Justice White's instruction as to the second *Montana* exception is more in the nature of a cue as to what a tribe is required to establish in order to fall within the protection of the second *Montana* exception, rather than a major alteration to the exception. This Court's interpretation of Justice White's *Brendale* modification, if indeed it is a modification, is hardly the last word on the subject. This Court might be better advised to avoid *Brendale* altogether.

**18.** *See also* Allotment Acts of 1899, 30 Stat. 1362, and 1906, 34 Stat. 124 (affecting the Lower Brule Tribe, a part of the special Allotment Acts Congress passed pursuant to the policy underlying the General Allotment Act of 1887, 24 Stat. 388).

retained inherent sovereignty as the second source of tribal authority.

### 3. Inherent Sovereignty

■ The Court has not been made aware of any express congressional delegation of authority granting the Tribe the right to regulate hunting and fishing by nonmember Indians or non-Indians on fee lands. If such authority exists it must be found in the inherent authority of the Tribe. *Montana*, 450 U.S. at 564–66, 101 S.Ct. at 1258. Indeed, this inherent tribal authority can be asserted if the Tribe can establish that either of the two *Montana* exceptions have been satisfied.

### a. The First *Montana* Exception

■ As previously set forth, under the first *Montana* exception, "[a] tribe may regulate ... the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Montana*, 450 U.S. at 565, 101 S.Ct. at 1258. In asserting that a consensual relationship does exist, the Tribe focuses on the original sale of land to nonmember Indians. According to the Tribe, the sale of land to a nonmember on the Reservation carried with it certain privileges and responsibilities to the remainder of the Reservation, and upon purchasing the Reservation land the nonmember consented to respect and abide by the tribal laws that protected important tribal interests in wildlife. The Court is not persuaded. Both *Montana* and *Bourland III* dictate a contrary conclusion. In *Montana*, the Supreme Court determined that "[n]on-Indian hunters and fishermen on non-Indian fee land do not enter any agreements or dealings with the Crow Tribe so as to subject themselves to tribal civil jurisdiction." *Id.* at 450 U.S. at 566, 1259. In *Bourland IV*, the Eighth Circuit Court of Appeals came to the same conclusion when it agreed with the district court that in the context of hunting and fishing regulation, the first *Montana* exception is not relevant. *Bourland IV*, 39 F.3d at 869. The purchase of a hunting or fishing license does not give rise to a consensual relationship between the purchaser and the Tribe. Therefore, this Court finds that the first *Montana* exception which permits tribal regulation pursuant to consensual relationships entered into with an Indian tribe or its members has not been satisfied.

### b. The Second *Montana* Exception

■ As originally set forth by the *Montana* Court, "[a] tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Montana*, 450 U.S. at 566, 101 S.Ct. at 1258. The Tribe contends that State regulation of hunting and fishing on nonmember fee lands and waters within the Reservation boundaries adversely affects the Tribe in the following ways: (1) it deprives the Tribe of job opportunities for its members employed to provide regulatory functions; (2) it results in lost revenues from licensing; (3) in some instances, harvesting of deer on fee lands adversely affects game populations on trust lands; and (4) it creates confusion and discourages use of the Reservation due to the presence of a second governmental entity to enforce a separate set of laws. *See* Tribe's Second Response to State's Statement of Material Facts ¶¶ 30, 62, 63, 64, 84. The Court notes that to a certain extent all of these adverse effects were present in either or both *Montana* and *Bourland III*, and the adverse impact or harm cause thereby was insufficient to trigger the second exception. However, in order for this Court to determine whether the nonmember conduct is of sufficient magnitude to satisfy the second *Montana* exception, the Court undertakes a particularized inquiry into the unique facts and circumstances surrounding the Lower Brule Reservation and the Lower Brule Sioux Tribe. *See Brendale*, 492 U.S. at 428–30, 109 S.Ct. at 3007. The Tribe's individual history, the demographic evidence of population, population mix, and respective economic mission of the Reservation are all factors which will affect this inquiry.

Both the State and the Tribe seek to derive income from non-Indians and nonmember Indians through fees and licenses arising from hunting and fishing on the fee lands

and waters; however, approximately only nine cents of every dollar spent by sportsmen on the Reservation is actually derived from license fees. Furthermore, whether the Tribe or the State collects the license fees, a significant portion of the revenue is and should be reinvested into wildlife restoration and management on the Reservation. The substantial year-round revenue derived from nonconsumptive recreation associated with wildlife and the job opportunities created by these nonconsumptive activities are of greater significance to the tribal economy then the license fees and job opportunity provided by regulatory functions. In addition, the financial strength of the Tribe has been greatly improved by the introduction of gaming and the accompanying casinos onto the Reservation. Any loss of license revenue and job opportunity relating to regulatory functions does not threaten "the political integrity, the economic security, or the health or welfare of the tribe." *Montana,* 450 U.S. at 566, 101 S.Ct. at 1258.

The Tribe's third contention that the harvesting of deer on nonmember fee lands adversely affects game populations on certain trust lands was described by the Eighth Circuit Court of Appeals as "undeniably ... vexatious to the individual Indians affected, but ... [does] not amount to a direct effect on ... the [Cheyenne River Sioux] Tribe as a whole." *Bourland IV,* 39 F.3d at 870. This conclusion was premised on the district court's finding that "non-Indian deer hunting 'on the taken area and the nonmember fee lands does reduce the amount of deer available to tribal members,' but 'does not decrease subsistence hunting by members as few deer are harvested by members for subsistence purposes.' " *Id.* (quoting *South Dakota v. Ducheneaux,* Civil No. 88–3049, 1990 WL 605077, slip op. at 11 (D.S.D.1990)) (*Bourland I*).[19] Of the 235,800 acres within the Reservation boundaries, 56,634 acres, approximately one-quarter of the Reservation, are deeded lands held in fee. Wildlife herds such as deer do migrate from and across fee lands, trust lands, tribal lands, and allotted lands. It is therefore obvious that nonmember deer hunting on nonmember fee lands

will to a certain extent reduce the overall deer population on the Reservation, including the trust lands. However, as was the case in *Bourland I,* the Tribe has made no showing that a significant portion of the 1,035 resident Indians depend on venison, or upon any other type of wild game, for subsistence purposes. Therefore, this Court concludes that the harvesting of deer on nonmember fee lands in no way threatens "the political integrity, the economic security, or the health or welfare of the tribe." *Montana,* 450 U.S. at 566, 101 S.Ct. at 1258.

The Tribe's final contention is that State regulation of hunting and fishing on nonmember fee lands and waters creates confusion and discourages use of the Reservation due to the presence of a second governmental entity to enforce a separate set of laws. To be sure, the boundaries between fee lands, trust lands, tribal lands, and allotted lands are not marked by boundary markers, making it difficult for persons entering and hunting upon the Reservation to determine the ownership of the checkerboard tracts of land. However, the Supreme Court in *Montana, Brendale,* and *Bourland III* "authorized such 'checkerboard' jurisdiction by mandating that neighboring tracts of land be subject to different regulatory authorities on the basis of the type of ownership, or the nature, of the land. This mandated 'checkerboarding' has been in effect now for at least [fifteen years]; if it is a problem that needs fixing, the remedy lies with Congress, not the courts." *Bourland II,* 949 F.2d at 996.

The Court recognizes the Tribe's history of wildlife regulation which includes the Tribe's adoption of the Wildlife Management Code of 1982, which was installed to provide for the management and control of wildlife, fishery, and outdoor recreation resources of the Reservation. Although the Game and Fish Management Code of 1961 did recognize that non-Indians should abide by State laws, the Tribe contends that under the 1982 Code, State laws were presumed to be inapplicable within the Reservation boundaries. The Tribe has not enforced its regulations on the

---

19. The case was originally filed against Ducheneaux, chairman of the Cheyenne River Sioux Tribal Council. Bourland's name was substituted when he became chairman.

Missouri River during the period of the 1986 agreement with the State, however, prior to the 1986 agreement the Tribe did require a tribal hunting license. Based on this history of regulation, the Court finds that unlike the Crow Tribe in *Montana*, the Lower Brule Sioux Tribe has not "traditionally accommodated itself to the State's 'near exclusive' regulation of hunting and fishing on fee lands within the reservation." *See Montana*, 450 U.S. at 566, 101 S.Ct. at 1259. However, in *Bourland IV*, the Cheyenne River Sioux Tribe's history of regulation and nonacquiescence to State assertion of jurisdiction did not justify a determination that the second *Montana* exception had been satisfied. *See Bourland IV*, 39 F.3d at 872 (Heaney, J. dissenting) (quoting *Bourland I*, 1990 WL 605077, slip op. at 9–10) (focusing on the Cheyenne River Sioux Tribe's regulatory history).

The successful implementation of the Wildlife Management Code, the protection of tribal hunting and fishing interests, and the overall management of wildlife on the Reservation, is not dependent upon the Tribe's ability to regulate nonmember hunting and fishing activities on nonmember fee lands and waters. Although the Tribe has convinced this Court that the State's wildlife management and game enhancement programs on the Reservation are heavily subsidized by the federal government, there has been no showing "that the State has abdicated or abused its responsibility for protecting and managing wildlife." *Montana*, 450 U.S. at 566 n. 16, 101 S.Ct. at 1259 n. 16. Furthermore, the Tribe still retains jurisdiction over its members, as well as jurisdiction over the 119,900 acres in Indian ownership.

The Court finds that State regulation of nonmember and non-Indian hunting and fishing does not threaten "the political integrity, the economic security, or the health or welfare of the tribe." *Id.* at 566, 101 S.Ct. at 1258. The second *Montana* exception has not been met.

### 4. State Jurisdiction

The *Bourland III* Court did not address the issue of state jurisdictional authority in light of the fact that "the State [had] sought only a judicial determination regarding the [Cheyenne River Sioux] Tribe's claim to regulatory jurisdiction." *Bourland III*, 508 U.S. at —— n. 12, 113 S.Ct. at 2318 n. 12; *see also Bourland IV*, 39 F.3d at 870 n. 6. However, in this case the Tribe in its complaint has set forth that it is seeking a declaration "concerning the legal rights of the parties as to their respective authority to enforce their laws with the exterior boundaries of the Reservation." Tribe's Complaint at 11. The State in its answer filed on November 25, 1991, requested this Court to enter an Order and Judgment "[d]eclaring that the State has exclusive jurisdiction to regulate hunting and fishing by non-Indians and non-member Indians on reservation lands (and overlying waters)." State's Answer at 5. Furthermore, the State in its motion for summary judgment filed on September 11, 1995, framed the issues in terms of exclusive State jurisdiction. Therefore, the issue pertaining to the State's authority to assert its hunting and fishing laws on both nonmember fee and taken area lands and waters within the Reservation boundaries is properly before this Court.

 The Supreme Court recognized that "[l]ong ago the Court departed from Mr. Chief Justice Marshall's view that 'the laws of [a State] can have no force' within reservation boundaries." *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 141, 100 S.Ct. 2578, 2582, 65 L.Ed.2d 665 (1980) (quoting *Worcester v. Georgia*, 6 Pet. 515, 561, 8 L.Ed. 483 (1832)). In order for a district court to make a determination concerning the State's authority to enforce its hunting and fishing laws within the borders of a reservation, the court must apply and analyze two independent but related doctrines. First, the doctrine of federal preemption. *Bracker*, 448 U.S. at 142–43, 100 S.Ct. at 2583 (citing *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 172, 93 S.Ct. 1257, 1262, 36 L.Ed.2d 129 (1973)). Second, the doctrine of tribal self-government which pertains to "the right of reservation Indians to make their own laws and be ruled by them." *Bracker*, 448 U.S. at 142, 100 S.Ct. at 2583 (quoting *Williams v. Lee*, 358 U.S. 217, 220, 79 S.Ct. 269, 271, 3 L.Ed.2d 251 (1959)). The two doctrines are independent in that standing

alone, either can form the basis for denying a state the authority to regulate activity within a reservation. *Id.* They are related in the sense that "tribal self-government is ultimately dependent on and subject to the broad power of Congress" and "traditional notions of Indian self-government are so deeply engrained in our jurisprudence that they have provided an important 'backdrop' ... against which vague or ambiguous federal enactments must always be measured." *Id.*

■ As previously set forth in this Court's analysis of inherent tribal sovereignty, the *Montana* court stated that the "regulation of hunting and fishing by nonmembers of a tribe on lands no longer owned by the tribe bears no clear relationship to tribal self-government or internal relations." *Montana,* 450 U.S. at 564, 101 S.Ct. at 1258. This Court has also endeavored to undertake an extensive analysis concerning the two *Montana* exceptions, in which it has determined that under the facts and circumstances surrounding this Tribe and Reservation, neither exception has been satisfied. The Court therefore concludes that the doctrine of tribal self-government standing alone does not preclude the State from exercising its jurisdictional authority over nonmember Indians on nonmember fee lands and waters within the Reservation boundaries. Even so, the doctrine of tribal self-government does remain and will be considered as an important "backdrop" in the Court's federal preemption analysis.

In *Bracker,* the Supreme Court instructed that,

> When on-reservation conduct involving only Indians is at issue, state law is generally inapplicable, for the State's regulatory interest is likely to be minimal and the federal interest in encouraging tribal self-government is at its strongest. More difficult questions arise where, as here, a State asserts authority over the conduct of non-

Indians engaging in activity on the reservation. In such cases we have examined the language of the relevant federal treaties and statutes in terms of both the broad policies that underlie them and the notions of sovereignty that have developed from historical traditions of tribal independence. This inquiry is not dependent on mechanical or absolute conceptions of state or tribal sovereignty, but has called for a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law.

*Bracker,* 448 U.S. at 144–45, 100 S.Ct. at 2584 (citations omitted). *Bourland III, Brendale,* and *Montana* establish that certain treaty rights held by the Lower Brule Sioux Tribe under the Fort Laramie Treaty of 1868, 15 Stat. 649, were abrogated with the passage of the General Allotment Act of 1887, 24 Stat. 388.[20] With this in mind, the Court will proceed to balance the federal, state, and tribal interests as they relate to the regulation of nonmember fee lands and waters within the Reservation boundaries.

■ The federal government has provided economic support to both the State and the Tribe through federally funded programs aimed at the overall management and enhancement of wildlife on the Reservation. Stemming from this aid, the federal government naturally has an interest in the successful regulation of wildlife on the Reservation. Although Congress has the power to regulate hunting and fishing within the fee areas, it has chosen a different course. The Tribe cites *Bracker* for the proposition that this Court should infer from the federal government's financial support that the federal government has undertaken a comprehensive regulation of hunting and fishing as to preempt State regulation.[21] The Tribe's contention is misplaced.

---

**20.** *See also* Allotment Acts of 1899, 30 Stat. 1362, and 1906, 34 Stat. 124 (affecting the Lower Brule Tribe, a part of the special Allotment Acts Congress passed pursuant to the policy underlying the General Allotment Act of 1887, 24 Stat. 388).

**21.** The Tribe also relies on *New Mexico v. Mescalero Apache Tribe,* 462 U.S. 324, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983), for the proposition that the Tribe's history of regulation is further evidence of a pervasive scheme acting to preempt State regulation. However, that case is distinguishable from the case at hand since it

In *Bracker*, the Supreme Court held that the federal government's regulation of the harvesting of Indian timber was comprehensive and therefore preempted state regulation. *Bracker*, 448 U.S. at 144–45, 100 S.Ct. at 2584. The regulation of timber harvesting was found to take "the form of Acts of Congress, detailed regulations promulgated by the Secretary of the Interior, and day-to-day supervision by the Bureau of Indian Affairs." *Id.* As to the regulation of hunting and fishing on nonmember fee areas on the Lower Brule Reservation, there are no congressional acts, nor are there detailed regulations promulgated by the Secretary of the Interior. The federal government does not comprehensively regulate nor does it enforce any hunting and fishing regulations within the fee areas, with the exception of certain laws pertaining to endangered species. The United States Fish and Wildlife Service simply lacks the workforce required to effectively regulate and enforce laws pertaining to hunting and fishing within the fee areas; therefore, the federal government must rely on another sovereign to preserve and protect its investment. As previously established, the Tribe has not been relegated such authority by Congress through treaties or statutes, nor does the Tribe retain jurisdiction from its inherent sovereignty. There is simply no overriding federal interest that would be frustrated by State regulation; rather, the federal interest of protecting its financial investment as well as its responsibility to the Indian people must and can only practicably be achieved through State regulation on the nonmember fee lands and waters.

■ As set forth by the Supreme Court, "notions of Indian sovereignty have been adjusted to take account of the State's legitimate interests in regulating the affairs of non-Indians." *McClanahan*, 411 U.S. at 171, 93 S.Ct. at 1262. Naturally, the State has an interest in assuring that nonmember Indians and non-Indians are subjected only to regulation by a government in which they may participate. *Cf. Boos v. Barry*, 485 U.S. 312, 324, 108 S.Ct. 1157, 1165, 99 L.Ed.2d 333 (1988). Typically, neither nonmember Indians nor non-Indians can vote in tribal council elections, participate in the tribal jury system, hold tribal office, or participate in the adoption of tribal hunting and fishing regulations. *See* Veronica L. Bowen, *The Extent of Indian Regulatory Authority Over Non–Indians: South Dakota v. Bourland*, 27 Creighton L.Rev. 605, 656 (1994) (citing *Duro*, 495 U.S. at 687–89, 110 S.Ct. at 2061; *Brendale*, 492 U.S. at 445–47, 109 S.Ct. at 3016; *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 194, 98 S.Ct. 1011, 1013, 55 L.Ed.2d 209 (1978)). However, nonmember Indians and non-Indians, as well as member Indians, may all participate in State elections.

■ The Supreme Court has also recognized that "[a] State's regulatory interest will be particularly substantial if the State can point to off-reservation effects that necessitate state intervention." *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 336, 103 S.Ct. 2378, 2388, 76 L.Ed.2d 611 (1983) (citing *Puyallup Tribe v. Washington Game Dep't*, 433 U.S. 165, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977)). Although this Court has determined that the State has provided only minimal financial assistance to the management and enhancement of wildlife on the Reservation, it has invested a considerable amount of time and interest in implementing the funds provided by the federal government. In addition, wildlife within the fee areas migrate from and across the Reservation and State borders, thereby generating a State interest in preserving its natural resources.

■ As previously established, the successful implementation of the Wildlife Management Code, the protection of tribal hunting and fishing interests, and the overall management of wildlife on the Reservation, are not dependent upon the Tribe's ability to

---

pertained only to the regulation of hunting and fishing by non-Indians on *trust lands*, as opposed to fee lands. *Id.* at 329–31, 103 S.Ct. at 2384. In addition, this Court has already set forth that in *Bourland IV* the Cheyenne River Sioux Tribe's history of regulation and nonacquiescence to State assertion of jurisdiction did not justify a determination that the second *Montana* exception had been satisfied. *See Bourland IV*, 39 F.3d at 872 (Heancy, J. dissenting) (quoting (*Bourland I*), 1990 WL 605077, slip op. at 9–10) (focusing on the Cheyenne River Sioux Tribe's regulatory history).

regulate nonmember hunting and fishing activities on nonmember fee lands and waters. Rather, in light of the fact that the Tribe does not retain jurisdiction over nonmembers on the nonmember fee areas, and the federal government does not maintain the resources necessary to undertake the regulation, the Tribal interests are dependent on the State's effective regulation of these fee areas. There has been no showing "that the State has abdicated or abused its responsibility for protecting and managing wildlife." *Montana*, 450 U.S. at 566 n. 16, 101 S.Ct. at 1259 n. 16. There is no conflict between State and Tribal laws as to nonmember Indians hunting and fishing on nonmember fee areas since it has already been established that the Tribe has no jurisdiction over said areas. Therefore, this Court does not believe that principles of federal Indian law, whether stated in terms of preemption, tribal self-government, or otherwise, preclude the State from lawfully exercising jurisdiction over nonmember Indians and non-Indians on the fee lands and waters.

In conclusion, the Court finds that no genuine issue of material fact exists, and the Tribe has failed to establish significant probative evidence to prevent summary judgment on the jurisdictional issue over nonmember fee lands and waters. *See Lambert Plumbing*, 934 F.2d at 979.

## C. JURISDICTION OVER TAKEN AREA LANDS AND WATERS

The final issue before this Court pertains to jurisdiction over nonmember Indians and non-Indians on lands and waters located in the Fort Randall and Big Bend taken areas within the boundaries of the Reservation.

### 1. Legal Precedent

In *Bourland III*, the Supreme Court addressed the jurisdictional complexities surrounding taken area lands. In *Bourland III*, the Cheyenne River Sioux Tribe and its members had conveyed land to the United States under the Cheyenne River Taking Act, 68 Stat. 1191 (1954), for the construction of the Oahe Dam and Reservoir. 508 U.S. at —— – ——, 113 S.Ct. at 2313–14. The *Bourland III* Court relied on the framework

established in *Montana* to examine the federal taking since "*Montana* [also] concerned an Indian tribe's power to regulate non-Indian hunting and fishing on lands located within a reservation but no longer owned by the tribe or its members." *Id.* at ——, ——, 113 S.Ct. at 2316, 2318.

■ As was the case in *Montana* and *Brendale*, the *Bourland III* Court in its analysis identified tribal treaty rights and inherent sovereignty as two sources of authority which could support a finding that a tribe had the power to regulate nonmember hunting and fishing on federal taken lands. *Id.* at ——, ——, 113 S.Ct. at 2316, 2319. As to the first source of authority, the Court ultimately concluded that "Congress, through the Flood Control and Cheyenne River Acts eliminated the Tribe's power to exclude non-Indians from these lands, and with that the incidental regulatory jurisdiction formerly enjoyed by the Tribe [pursuant to the Fort Laramie Treaty of 1868]." *Id.* at —— – ——, 113 S.Ct. at 2316–17. The Court premised this determination on the interpretation that the Flood Control Act of 1944 effectuated an opening of the lands taken for the Oahe Project for the general recreational use of the public, thereby abrogating any original treaty right to regulate non-Indian hunting and fishing within the federal taken areas. *Id.* at ——, 113 S.Ct. at 2317. The same conclusion can be derived as to the lands taken for the Big Bend and Fort Randall Projects, since the Flood Control Act of 1944 also effectuated an opening of the lands taken for said Projects. *See* 16 U.S.C. § 460d. However, the *Bourland III* Court proceeded one step further, finding that even "[i]f the Flood Control Act leaves any doubt whether the Tribe retains its original treaty right to regulate non-Indian hunting and fishing on lands taken for federal water projects, the Cheyenne River Act extinguishes all such doubt." *Id.*

In its analysis of the Cheyenne River Act, the Court focused on two key provisions. First, the Act's declaration that the payments made to the Cheyenne River Sioux Tribe "shall be in final and complete settlement of all claims, rights, and demands" of the tribe, indicated that there was an under-

standing by both the tribe and the government that the Act included all of the terms and rights the tribe and its members would enjoy. *Id.* (citing Cheyenne River Act, 68 Stat. 1191). Second, the Court analyzed section 10 of the Act which provided that,

> [T]he said Indian Tribe and the members thereof shall have the right to graze stock on the land between the level of the reservoir and the taking line.... The said Tribal Council and the members of said Indian Tribe shall have, without cost, the right of free access to the shoreline of the reservoir including the right to hunt and fish in and on the aforesaid shoreline and reservoir, subject, however, to regulations governing the corresponding use by other citizens of the United States.

Cheyenne River Act, 68 Stat. 1193, § 10. The Supreme Court, in determining that this provision should not be construed to grant the tribe an additional right to regulate hunting and fishing by non-Indians, reasoned that "[i]f Congress had intended by this provision to grant the Tribe the additional right to regulate hunting and fishing, it would have done so by a similarly explicit statutory command." *Id.* Based on the instruction provided in the *Bourland III* Court's interpretation of the Cheyenne River Act, this Court will proceed to analyze the language contained within the two taking acts at issue in this case.

### 2. Treaty Rights

■ Section 1 of the Fort Randall Taking Act, Pub.L. No. 85–923, 72 Stat. 1773, provides that the payments made to the Lower Brule Sioux Tribe shall be in "settlement of all claims, rights, and demands of said tribe." The Court construes this language to indicate that there was an understanding by both the Tribe and the government that the Act included all of the terms and rights the Tribe and its members would enjoy. Section 5 of the Act further provided that,

> [T]he said Indian tribe and the members thereof shall be given exclusive permission, without cost, to graze stock on the land between the water level of the reservoir and the exterior boundary of the taking area. The said tribal council and the members of said Indian tribe shall be per-

mitted to have, without cost, access to the shoreline of the reservoir including permission to hunt and fish in and on the aforesaid shoreline and reservoir, subject, however, to regulations governing the corresponding use by other citizens of the United States.

Fort Randall Taking Act, § 5. It is clear that this provision, which is almost identical to that in section 10 of the Cheyenne River Act, must be construed as depriving the Tribe of any treaty right to regulate non-Indian hunting and fishing within the Fort Randall taken area. *See Bourland III,* 508 U.S. at ——, 113 S.Ct. at 2317.

■ This Court reaches the same conclusion as to the Big Bend Taking Act, Pub.L. No. 87–734, 76 Stat. 698. The Act's declaration that the payments made to the Tribe "shall be in settlement of all claims, rights, and demands of the tribe and individual Indians arising out of the taking under this Act" indicates that there was an understanding by both the Tribe and the government that the Act included all of the terms and rights the Tribe and its members would enjoy. *See* Big Bend Taking Act, § 1(a)(2). Section 10 of the Big Bend Taking Act provides that,

> The tribe and members thereof shall have without cost the right to hunt and fish in and on the aforesaid shoreline and reservoir, subject, however, to regulations governing the corresponding use by other citizens of the United States.

Big Bend Taking Act, § 10. This Court finds that this provision must also be construed as depriving the Tribe of any treaty right to regulate non-Indian hunting and fishing within the Big Bend taken area, in light of the Supreme Court's reasoning that "[i]f Congress had intended by this provision to grant the Tribe the additional right to regulate hunting and fishing, it would have done so by a similarly explicit statutory command." *Bourland III,* 508 U.S. at ——, 113 S.Ct. at 2317. Therefore, this Court concludes that Congress, through the Flood Control Act of 1944 and the Fort Randall and Big Bend Taking Acts, eliminated the Tribe's power to exclude non-Indians from these lands, and with that the incidental regulatory

jurisdiction formerly enjoyed by the Tribe pursuant to the Fort Laramie Treaty of 1868. *Id.* at ———– ———, 113 S.Ct. at 2316–17.

### 3. Inherent Sovereignty

Having concluded that the Tribe does not derive any authority to regulate nonmember and non-Indians hunting and fishing within the taken areas from any relevant treaty rights, the Court's analysis must focus on the general principles of retained inherent sovereignty as the second source of tribal authority. Since the Court is unaware of any express congressional delegation of authority to the Tribe pertaining to the regulation of hunting and fishing as to nonmember Indians or non-Indians within the taken areas, the Court's analysis must proceed under the general principle against tribal authority over nonmember Indians in the context of civil regulatory jurisdiction. *Bourland III,* —— U.S. at ——, 113 S.Ct. at 2320 (citing *Montana,* 450 U.S. at 564–66, 101 S.Ct. at 1258). This principle against tribal authority can be overcome if the Tribe can establish that either of the two *Montana* exceptions have been satisfied.

#### a. The First *Montana* Exception

As previously set forth, under the first *Montana* exception, "[a] tribe may regulate ... the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Montana,* 450 U.S. at 565, 101 S.Ct. at 1258. The Tribe contends that this first exception has been satisfied since Congress's grant of public access to an area within the boundaries of the Reservation created an implied obligation by each member of the public to be respectful of the property interests that both the Tribe and the Corps have within and around the taken areas. The Tribe further asserts that as a result of the interest in the hunting and fishing assets that it has developed, nurtured, and protected, as well as an interest in the continued grazing of livestock, that the public has in effect contracted to refrain from activities that would diminish the value of those assets.

■■■ As was the case with the nonmember fee areas, this Court is of the opinion that both *Montana* and *Bourland IV* dictate a contrary conclusion. In *Montana,* the Supreme Court concluded that "[n]on-Indian hunters and fishermen on non-Indian fee land do not enter any agreements or dealings with the Crow Tribe so as to subject themselves to tribal civil jurisdiction." *Montana,* 450 U.S. at 566, 101 S.Ct. at 1259. It is also clear that nonmember sportsmen hunting and fishing within the taken areas at issue in this case do not enter into the type of agreement or dealing necessary to trigger implication of the first *Montana* exception. Furthermore, in *Bourland IV,* the Eighth Circuit Court of Appeals on remand came to the same conclusion as to the taken area on the Cheyenne River Sioux Reservation when it agreed with the district court that in the context of hunting and fishing regulation the first *Montana* exception is not relevant. *Bourland IV,* 39 F.3d at 869. Therefore, this Court finds that the first *Montana* exception which permits tribal regulation pursuant to consensual relationships entered into with an Indian tribe or its members has not been satisfied as to the Big Bend and Fort Randall taken areas.

#### b. The Second *Montana* Exception

■■■ Finally, the Court must undertake an analysis of the second *Montana* exception as it pertains to the taken areas. As was the case with fee lands and waters, the Tribe contends that State regulation of hunting and fishing within the taken areas adversely affects the Tribe in the following ways: (1) it deprives the Tribe of job opportunities for its members employed to provide regulatory functions; (2) it results in lost revenues from licensing; (3) in some instances, harvesting of deer adversely affects game populations on trust lands; and (4) it creates confusion and discourages use of the Reservation due to the presence of a second governmental entity to enforce a separate set of laws. *See* Tribe's Second Response to State's Statement of Material Facts ¶¶ 30, 62, 63, 64, 84. For the same reasons previously set forth in the fee areas analysis, State regulation of nonmember and non-Indian hunting and fishing within the taken areas and the resulting effects simply do not threaten or constitute a

sufficient adverse effect on "the political integrity, the economic security, or the health or welfare of the tribe." *Montana,* 450 U.S. at 566, 101 S.Ct. at 1258.

### 4. State Jurisdiction

■ Having determined that the Tribe does not have the inherent authority to regulate nonmember and non-Indian hunting and fishing within the taken areas, the Court must next address the issue of whether the State has jurisdiction to regulate these activities. State jurisdiction may be precluded pursuant to the federal preemption doctrine or the doctrine of tribal self-government. *Bracker,* 448 U.S. at 142–43, 100 S.Ct. at 2583. Standing alone, the doctrine of tribal self-government does not foreclose State regulation given the fact that the "regulation of hunting and fishing by nonmembers of a tribe on lands no longer owned by the tribe bears no clear relationship to tribal self-government or internal relations." *Montana,* 450 U.S. at 564, 101 S.Ct. at 1258. However, the doctrine of tribal self-government does remain and will be considered as an important "backdrop" in the Court's federal preemption analysis.

■ It is clear that Congress provided the Army Corps of Engineers with the regulatory control over the taken areas at issue in this case. 16 U.S.C. § 460d; *see also Bourland III,* 508 U.S. at ——, ——, 113 S.Ct. at 2317, 2320. Therefore, this Court must ultimately resolve two matters. First, the Court must determine whether the Corps has the ability to entrust the State with the regulation of hunting and fishing by non-Indians and nonmember Indians in the taken areas. If the Corps has the authority to relegate partial jurisdiction over the taken areas, the second issue is whether it has in fact relegated jurisdiction to the State. To aid in the resolution of these matters, as instructed by *Bracker,* the Court examines the language of relevant federal treaties and statutes, and undertakes "a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law." *Bracker,* 448 U.S. at 145, 100 S.Ct. at 2584.

■ From the language of the Flood Control Act of 1944, which effectuated the opening of the lands for the Big Bend and Fort Randall Projects, State law has not been preempted. As set forth in the Act, "[n]o use of any area to which [the Flood Control Act] applies shall be permitted which is inconsistent with the laws for the protection of fish and game of the State in which such area is situated." *See* 16 U.S.C. § 460d. Furthermore, both the Big Bend Taking Act and the Fort Randall Taking Act grant tribal members permission to hunt and fish within the taken areas, "subject, however, to regulations governing the corresponding use by other citizens of the United States." Fort Randall Taking Act, § 5; Big Bend Taking Act, § 10. Not only does this language act to deprive the Tribe of any treaty right to regulate non-Indian hunting and fishing within the taken areas, but it recognizes that other regulations will or at least may be in effect. *See Bourland III,* 508 U.S. at ——, 113 S.Ct. at 2317. The only logical interpretation of the other governing regulation language is that Congress anticipated that the federal government would rely heavily upon State regulation, given the fact that there are no comprehensive federal hunting and fishing regulations in effect for the taken areas.

The consistent federal administrative position favors State regulation over nonmember Indians and non-Indians within the taken areas. On March 9, 1976, Colonel Russell A. Glenn, Corps of Engineers, issued a letter to Lower Brule Chairman Mike Jandreau stating:

c. That lands purchased and/or condemned by the United States for the Ft. Randall and Big Bend Projects were returned to the public domain, and, as such, fall within the civil and criminal, or legislative jurisdiction of the State of South Dakota.

d. That the fish and game laws of the State of South Dakota are the only such laws that apply to these areas which were formerly owned by the Lower Brule Sioux Tribe and its members.

Letter from Colonel Russell A. Glenn, District Engineer for the Corps of Engineers, to Tribal Chairman Michael B. Jandreau of the Lower Brule Reservation at 5 (concerning the Tribe's attempts at enforcing tribal regulations within the taken areas). On September 15, 1986, Colonel Steven G. West, Corps of Engineers, reiterated the Corps' position as to jurisdiction over the taken areas, by setting forth that:

> The position of the Omaha District, as well as the State of South Dakota, has always been that regulation of hunting and fishing on Corps project lands in South Dakota is a matter of state law. This was clearly the intent of Section 4 of the 1944 Flood Control Act, 16 U.S.C. § 460d. As you know, the Corps has only proprietorial jurisdiction over its project lands along the mainstem of the Missouri River in South Dakota. Such lands remain subject to state civil and criminal jurisdiction.[22]

Letter from Colonel Steven G. West, District Engineer for the Corps of Engineers, to Secretary Jeff Stingley of the South Dakota Department of Game, Fish and Parks at 1 (concerning gill netting on mainstream reservoirs and the application of the Eighth Circuit Court of Appeals decision of *Lower Brule Sioux Tribe v. South Dakota*, 711 F.2d 809 (8th Cir.1983)).

The federal government's position on State jurisdiction was also expressed to the Senate Select Committee on Indian Affairs by John Velehradsky, the Chief of the Planning Division of the Missouri River Division, in the following manner:

> Senator, it is my understanding that, in this instance, *we would rely on the State agencies for jurisdiction over the enforcement of laws on those areas.* The United States or the Corps of Engineers has no jurisdiction in terms of enforcement within the project. We rely on the State agencies.... We have jurisdiction over the land, but in terms of enforcing State game

laws, we do not have any jurisdiction over State game laws.

U.S. Senate Hearing 100–500, (Nov. 19, 1987) (emphasis added).

Finally, the rules and regulations governing public use of Corps of Engineers water resources development projects likewise provide for the application of State laws. As set forth by 36 C.F.R. § 327.8,

> Hunting, fishing, and trapping are permitted except in areas where prohibited by the District Engineer. All Federal, *state and local laws* governing these activities apply on project lands and waters, as regulated by authorized enforcement officials.

36 C.F.R. § 327.8 (1995) (emphasis added). The rules and regulation further provide that,

> Except as otherwise provided herein or by Federal law or regulation, *state and local laws and ordinances* shall apply on project lands and waters. This includes, but is not limited to, state and local laws and ordinances governing:
>
> (a) Operation and use of motor vehicles, vessels, and aircraft;
>
> (b) Hunting, fishing and trapping....
>
> These state and local laws and ordinances are enforced by those *state and local enforcement agencies* established and authorized for that purpose.

36 C.F.R. § 327.26 (1995) (emphasis added). Although *Bourland III* did not resolve the issue of State jurisdiction over the taken area within the Cheyenne River Sioux Reservation, the Court provided an important interpretation of the phrase "local laws." *Bourland III*, 508 U.S. at —— n. 16, 113 S.Ct. at 2321 n. 16. The *Bourland III* Court read "an Army Corps regulation outlining the procedures for evaluating Department of the Army water use permit applications, [to indicate] that the Army Corps, in fact, distinguishes between the terms 'tribal' and 'lo-

---

22. The Corps of Engineers has taken the same position with regard to the public. In its May 1986 Guide entitled "Boating and Recreation," at sheet 1 of 8 n. 9, the Corps set forth that:

Hunting and fishing is allowed on the lake and project land in accordance with the rules and regulations established by the South Dakota

Department of Game, Fish and Parks and the U.S. Fish and Wildlife Service. These regulations may change annually, so hunters and fishermen are advised to review current regulations before engaging in these forms of recreation.

cal.'" *Id.* (citing 33 C.F.R. § 320.4(j)(2) ("The primary responsibility for determining zoning and land use matters rests with state, *local* and *tribal* governments.")). Therefore, this Court finds that the Army Corps of Engineers has the ability to and in fact has relegated partial jurisdiction to the State over *nonmember* Indians and non-Indians within the Fort Randall and Big Bend taken areas.

 The federal government has an interest in preserving the financial contributions it has made to wildlife development in the taken areas, as well as the fee areas. The federal government does not have in place a comprehensive regulatory scheme, nor does it have the workforce available on the Reservation to effectively police hunting and fishing by nonmember Indians within the taken areas. This is precisely why the Corps of Engineers has entrusted the State to undertake the regulation of hunting and fishing by nonmembers within said areas. As is the case with the fee areas, the State has a legitimate interest in assuring that nonmember Indians and non-Indians are subjected only to regulation by a government in which they may participate. The successful implementation of the Wildlife Management Code, the protection of tribal hunting and fishing interests, and the overall management of wildlife on the Reservation, are not dependent upon the Tribe's ability to regulate nonmember hunting and fishing activities within the taken areas. Rather, in light of the fact that the Tribe does not retain jurisdiction over the taken areas, and the federal government does not maintain the resources necessary to undertake the regulation, the tribal interests are dependent on the State's effective regulation of said areas. There has simply been no showing "that the State has abdicated or abused its responsibility for protecting and managing wildlife" in the taken areas. *Montana,* 450 U.S. at 566 n. 16, 101 S.Ct. at 1259 n. 16. Furthermore, there is no conflict between State and Tribal laws as to nonmember Indians and non-Indians within the taken areas since it has already been established that the Tribe does not have jurisdiction over these areas. Therefore, this Court does not believe that principles of federal Indian law, whether stated in terms of preemption, tribal self-government, or otherwise, preclude the State from lawfully exercising jurisdiction over nonmember Indians and non-Indians within the taken areas.

In conclusion, the Court finds that no genuine issue of material fact exists, and the Tribe has failed to established significant probative evidence to prevent summary judgment on the jurisdiction issue over the taken area lands and waters. *See Lambert Plumbing,* 934 F.2d at 979.

### CONCLUSION

Based on the above analysis, the Court concludes there is no distinction between nonmember Indians and non-Indians in the regulation of hunting and fishing within the boundaries of the Reservation. The Court further finds that based on the analytical framework provided by *Bourland III, Brendale,* and *Montana,* any treaty rights that would provide the Lower Brule Sioux Tribe with the authority to regulate nonmember and non-Indian hunting and fishing on nonmember fee lands and waters or within the taken areas have been abrogated. The Court further finds that as to inherent tribal sovereignty, nonmembers and non-Indians have not entered into a consensual relationship with the Tribe or its members as to satisfy the first *Montana* exception, nor would State regulation of nonmembers and non-Indians threaten or sufficiently affect "the political integrity, the economic security, or the health or welfare of the tribe" as to satisfy the second *Montana* exception. *Montana,* 450 U.S. at 564–66, 101 S.Ct. at 1258. Finally, this Court concludes that the State has jurisdiction to regulate nonmember and non-Indian hunting and fishing within both the fee and taken areas at issue in this case. A judgment shall issue forthwith.